**CLYDE & CO US LLP**
200 Campus Drive
Suite 300
Florham Park, NJ 07932-0950
(973) 210-6700
Attorneys for Plaintiff, Ramada Worldwide Inc.

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| RAMADA WORLDWIDE INC., a Delaware Corporation, | : | |
| | : | |
| Plaintiff, | : | Civil Action No. 13- |
| v. | : | |
| | : | **COMPLAINT** |
| NICK SHETH, an individual; and GHANSHYAM PATEL, an individual, | : | |
| | : | |
| Defendants. | : | |
| | : | |

Plaintiff Ramada Worldwide Inc., by its attorneys, Clyde & Co US LLP, complaining of defendants, Nick Sheth and Ghanshyam Patel, says:

### PARTIES, JURISDICTION AND VENUE

1.      Plaintiff Ramada Worldwide Inc. ("RWI") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Parsippany, New Jersey.

2.      Defendant Nick Sheth ("Sheth"), on information and belief, is a citizen of the State of Tennessee, residing at 1611 Ashley Mill Drive, Chattanooga, Tennessee 37421.

RWI 23733
919650v1
1106322

3.     Defendant Ghanshyam Patel ("Patel"), on information and belief, is a citizen of the State of New York, residing at 7200 Transit Road, Williamsville, New York 24221.

4.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 inasmuch as the plaintiff and all the defendants are citizens of different states and the amount in controversy in this matter, exclusive of interest and costs, exceeds the sum of $75,000.

5.     This Court has personal jurisdiction over Sheth and Patel by virtue of, among other things, the terms of a guaranty (the "Guaranty"), described in more detail below, pursuant to which Sheth and Patel acknowledged that they were personally bound by section 17 of a March 31, 2008 license agreement by and between Inn on the Hill Hattiesburg, LLC ("Hill Hattiesburg") and RWI (the "License Agreement"), described in more detail below, pursuant to which Hill Hattiesburg has consented "to the non-exclusive personal jurisdiction of and venue in the New Jersey state courts situated in Morris County, New Jersey and the United States District Court for the District of New Jersey . . . .".

6.     Venue is proper in this District pursuant to section 17.6.3 of the License Agreement, inasmuch as that provision contains an express waiver by Sheth and Patel of any objection to venue in this District.

## ALLEGATIONS COMMON TO ALL COUNTS

### The Agreements Between The Parties

7.     On or about March 31, 2008, RWI entered into the License Agreement with Hill Hattiesburg for the operation of a 119-room guest lodging facility located at 6595 US

- 2 -

Highway 49, Hattiesburg, Mississippi 39401, Site No. 23733-73285-01 (the "Facility").  A true copy of the License Agreement is attached hereto as Exhibit A.

8.      Pursuant to section 5 of the License Agreement, Hill Hattiesburg was obligated to operate a Ramada® guest lodging facility for a fifteen-year term.

9.      Pursuant to section 7, section 18.1 and Schedule C of the License Agreement, Hill Hattiesburg was required to make certain periodic payments to RWI for royalties, service assessments, taxes, interest, reservation system user fees, and other fees (collectively, "Recurring Fees").

10.     Pursuant to section 7.3 of the License Agreement, Hill Hattiesburg agreed that interest is payable "on any past due amount payable to [RWI] under this Agreement at the rate of 1.5% per month or the maximum rate permitted by applicable law, whichever is less, accruing from the due date until the amount is paid."

11.     Pursuant to section 3.8 of the License Agreement, Hill Hattiesburg was required to prepare and submit monthly reports to RWI disclosing, among other things, the amount of gross room revenue earned by Hill Hattiesburg at the Facility in the preceding month for purposes of establishing the amount of royalties and other Recurring Fees due to RWI.

12.     Pursuant to section 3.8 of the License Agreement, Hill Hattiesburg agreed to maintain at the Facility accurate financial information, including books, records, and accounts, relating to the gross room revenue of the Facility and, pursuant to sections 3.8 and 4.8 of the License Agreement, Hill Hattiesburg agreed to allow RWI to examine, audit, and make copies of the entries in these books, records, and accounts.

13.     Pursuant to section 11.2 of the License Agreement, RWI could terminate the License Agreement, with notice to Hill Hattiesburg, if Hill Hattiesburg (a) discontinued operating the Facility as a Ramada® guest lodging establishment or (b) lost the right to possession of the Facility.

14.     Pursuant to section 18.4 of the License Agreement, Hill Hattiesburg agreed that liquidated damages payable under section 12.1 would be $1,000.00 for each guest room of the Facility.

15.     Pursuant to section 17.4 of the License Agreement, Hill Hattiesburg agreed that the non-prevailing party would "pay all costs and expenses, including reasonable attorneys' fees, incurred by the prevailing party to enforce this [License] Agreement or collect amounts owed under this [License] Agreement."

16.     On or about March 31, 2008, RWI entered into a Connectivity Equipment Lease and Services Addendum (the "Connectivity Addendum") with Hill Hattiesburg.  A true copy of the Connectivity Addendum is attached hereto as Exhibit B.

17.     Pursuant to section 12(c) of the Connectivity Addendum, Hill Hattiesburg agreed that, in the event of a termination of the Connectivity Addendum, including by virtue of termination of the License Agreement, it would pay Connectivity Addendum Liquidated Damages to RWI in accordance with a formula specified in the Connectivity Addendum.

18.     Effective as of the date of the License Agreement, Sheth and Patel provided RWI with a Guaranty of Hill Hattiesburg's obligations under the License Agreement ("Guaranty").  A true copy of the Guaranty is attached hereto as Exhibit C.

19.     Pursuant to the terms of the Guaranty, Sheth and Patel agreed, among other things, that upon a default under the License Agreement, they would "immediately make each payment and perform or cause Franchisee to perform, each unpaid or unperformed obligation of Franchisee under the [License] Agreement."

20.     Pursuant to the terms of the Guaranty, Sheth and Patel agreed to pay the costs, including reasonable attorneys' fees, incurred by RWI in enforcing its rights or remedies under the Guaranty or the License Agreement.

<u>The Termination of the License Agreement</u>

21.     On February 11, 2010, Hill Hattiesburg filed for Chapter 11 Bankruptcy in the United States Bankruptcy Court, Southern District of Mississippi under case number 10-50289.

22.     On or about January 3, 2011, Hill Hattiesburg unilaterally terminated the License Agreement by ceasing to operate the Facility as a Ramada® guest lodging facility.

23.     By letter dated June 29, 2011, a true copy of which is attached as <u>Exhibit D</u>, RWI acknowledged Hill Hattiesburg's unilateral termination of the License Agreement, effective January 3, 2011, and advised Sheth and Patel that they were required to pay to RWI as liquidated damages the sum of $121,500.00 as required under the License Agreement and the Satellite Addendum, and all outstanding Recurring Fees through the date of termination.

**FIRST COUNT**

24.     RWI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 23 of the Complaint.

25.    Pursuant to the terms of the Guaranty, Sheth and Patel agreed, among other things, that upon a default under the License Agreement, they would immediately make each payment and perform each obligation required of Hill Hattiesburg under the License Agreement.

26.    Despite their obligation to do so, Sheth and Patel have failed to make any payments or perform or cause Hill Hattiesburg to perform each obligation required under the License Agreement.

27.    Pursuant to the Guaranty, Sheth and Patel are liable to RWI for Hill Hattiesburg's liquidated damages in the amount of $121,500.00, or actual damages in an amount to be determined at trial, and Hill Hattiesburg's Recurring Fees due and owing under the License Agreement, in the current amount of $273,261.85.

WHEREFORE, RWI demands judgment against Sheth and Patel for all liquidated damages, or actual damages, and Recurring Fees due and owing under the License Agreement, together with interest, attorneys' fees, and costs of suit.

CLYDE & CO US LLP
Attorneys for Plaintiff,
Ramada Worldwide Inc.

By: _____
        **BRYAN P. COUCH**

Dated: 2|19|13

## CERTIFICATION PURSUANT TO L. CIV. R. 11.2

I certify that, to the best of my knowledge, this matter is not the subject of any other action pending in any court or of any pending arbitration or administrative proceeding.

CLYDE & CO US LLP
Attorneys for Plaintiff,
Ramada Worldwide Inc.

By: _____
    BRYAN P. COUCH

Dated: 2|19|13

# EXHIBIT A

Location: **HATTIESBURG, MS**
Entity No. 73285-01
Unit No.: 23733

## RAMADA WORLDWIDE INC.
## LICENSE AGREEMENT

THIS LICENSE AGREEMENT ("Agreement"), dated 3/31 , 200 8 , is between **RAMADA WORLDWIDE INC.**, a Delaware corporation ("we", "our" or "us"), and **INN ON THE HILL HATTIESBURG, LLC**, a _____ limited liability company ("you"). The definitions of capitalized terms are found in Appendix A. In consideration of the following mutual promises, the parties agree as follows:

**1. License.** We have the exclusive right to license and franchise to you the distinctive "Ramada" System for providing transient guest lodging services. We grant to you and you accept the License, effective and commencing on the Opening Date and ending on the earliest to occur of the Term's expiration or a Termination. You will call the Facility a **"Ramada Inn."** You may adopt additional or secondary designations for the Facility with our prior written consent, which we may withhold, condition, or withdraw on written notice in our sole discretion. You shall not affiliate or identify the Facility with another franchise system, reservation system, brand, cooperative or registered mark during the Term.

**2. Ramada Inns National Association.**

2.1 **Membership.** You automatically become a member of the Ramada Inns National Association ("RINA"), an unincorporated association. Other Chain licensees are also members of RINA. RINA may consider and discuss common issues relating to advertising and operation of facilities in the System and, through its Executive Committee, make recommendations to us regarding such issues and other matters.

2.2 **RINA Conference.** You or your representative will attend each RINA Conference when it is held. You will pay not less than one "Conference Registration Fee" for each Facility you own. Additional Facility representatives may attend subject to conference policies and after payment of an additional Conference Registration Fee for each such additional attendee. You will pay the costs of transportation, lodging and meals (except those we provide as part of the Conference) for your attendees.

**3. Your Improvement and Operating Obligations.** Your obligations to improve, operate and maintain the Facility are:

3.1 **Improvements.** You must select and acquire the Location and acquire, equip and supply the Facility in accordance with System Standards. You must provide us with proof that you own or lease the Facility before or within 30 days after the Effective Date. You must begin renovation of the Facility no later than thirty (30) days after the Effective Date. The deadline for completing the pre-opening phase of conversion and the renovations specified on any Punch List attached to this Agreement is ninety (90) days after the Effective Date. All renovations will

1

comply with System Standards, any Approved Plans and the Punch List.   Your general contractor or you must carry the insurance required under this Agreement during renovation. You must complete the pre-opening renovation specified on the Punch List before we consider the Facility to be ready to open under the System.   You must continue renovation and improvement of the Facility after the Opening Date if the Punch List so requires. We may, in our sole discretion, terminate this Agreement by giving written notice to you (subject to applicable law) if (1) you do not commence or complete the pre-opening or post-opening improvements of the Facility by the dates specified in this Section, or (2) you prematurely identify the Facility as a Chain Facility or begin operation under the System name described in Schedule B in violation of Section 3.3 and you fail to either complete the pre-opening Improvement Obligation or cease operating and/or identifying the Facility under the Marks and System within five days after we send you written notice of default.  Time is of the essence for the Improvement Obligation.  We may, however, in our sole discretion, grant one or more extensions of time to perform any phase of the Improvement Obligation.   You will pay us a non-refundable extension fee of $2.00 per room for each day of any extension of the deadline for completing pre-opening improvements. This fee will be payable to us after each 30 days of the extension.  You will pay us the balance of the extension fee outstanding when the Facility opens under the System 10 days after the Opening Date.  You must also pay us the Reinspection Fee described in Section 3.9 if you fail to complete any Improvement Obligation by the deadline established in the Punch List and our representatives must return to the Facility to inspect it.  We may grant you an extension of time to complete the items on your Punch List in our sole discretion.  The grant of an extension to perform your Improvement Obligation will not waive any other default existing at the time the extension is granted.

3.2  **Improvement Plans.**  You will create plans and specifications for the work described in Section 3.1 (based upon the System Standards and this Agreement) if we so request and submit them for our approval before starting improvement of the Location.  We will not unreasonably withhold or delay our approval, which is intended only to test compliance with System Standards, and not to detect errors or omissions in the work of your architects, engineers, contractors or the like.  Our review does not cover technical, architectural or engineering factors, or compliance with federal, state or local laws, regulations or code requirements.  We will not be liable to your lenders, contractors, employees, guests, others or you on account of our review or approval of your plans, drawings or specifications, or our inspection of the Facility before, during or after renovation or construction.  Any material variation from the Approved Plans requires our prior written approval.   You will promptly provide us with copies of permits, job progress reports, and other information as we may reasonably request.  We may inspect the work while in progress without prior notice.

3.3  **Pre-Opening.**  You may identify the Facility as a Chain Facility prior to the Opening Date, or commence operation of the Facility under a Mark and using the System, only after first obtaining our approval or as permitted under and strictly in accordance with the System Standards Manual.  If you identify the Facility as a Chain Facility or operate the Facility under a Mark before the Opening Date without our express written consent, then in addition to our remedies under Sections 3.1 and 11.2, you will begin paying the Royalty to us, as specified in Section 7.1, from the date you identify or operate the Facility using the Mark.  We may delay the Opening Date until you pay the Royalty accruing under this Section.

3.4 **Operation.** You will operate and maintain the Facility continuously after the Opening Date on a year-round basis as required by System Standards and offer transient guest lodging and other related services of the Facility (including those specified on Schedule B) to the public in compliance with the law and System Standards. You will keep the Facility in a clean, neat, and sanitary condition. You will clean, repair, replace, renovate, refurbish, paint, and redecorate the Facility and its FF&E as and when needed to comply with System Standards. The Facility will be managed by either a management company or an individual manager with significant training and experience in general management of similar lodging facilities. The Facility will accept payment from guests by all credit and debit cards we designate in the System Standards Manual and follow standard industry practices for safeguarding cardholder information, including but not limited to, the Payment Card Industry Data Security Standard.. You may add to or discontinue the amenities, services and facilities described in Schedule B, or lease or subcontract any service or portion of the Facility, only with our prior written consent which we will not unreasonably withhold or delay. Your front desk operation, telephone system, parking lot, swimming pool and other guest service facilities may not be shared with or used by guests of another lodging or housing facility.

3.5 **Training.** You (or a person with executive authority if you are an entity) and the Facility's general manager (or other representative who exercises day to day operational authority) will attend the training programs described in Section 4.1 we designate as mandatory for licensees or general managers, respectively. You will train or cause the training of all Facility personnel as and when required by System Standards and this Agreement. You will pay for all travel, lodging, meals and compensation expenses of the people you send for training programs, the cost of training materials and other reasonable charges we may impose for training under Section 4.1, and all travel, lodging, meal and facility and equipment rental expenses of our representatives if training is provided at the Facility.

3.6 **Marketing.** You will participate in System marketing programs, including the Directory and the Reservation System. You will obtain and maintain the computer and communications service and equipment we specify to participate in the Reservation System. You will comply with our rules and standards for participation, and will honor reservations and commitments to guests and travel industry participants. You authorize us to offer and sell reservations for rooms and services at the Facility according to the rules of participation and System Standards. You may implement, at your option and expense, your own local advertising. Your advertising materials must use the Marks correctly, and must comply with System Standards or be approved in writing by us prior to publication. You will stop using any non-conforming, out-dated or misleading advertising materials if we so request.

3.6.1 You will participate in any regional management association ("RMA") of Chain licensees formed to provide regional marketing, training, and other benefits for Chain Facilities in your area. You will pay the RMA Fee described in Schedule C to support the RMA's activities, if and when levied.

3.6.2 The Facility must participate in our Chain-wide Internet marketing activities like other marketing programs, including arrangements we make with third party distribution channels.

You shall provide us with information and photographs of the Facility in accordance with System Standards for posting on the Chain website. The content you provide us or use yourself for any Internet marketing must be true, correct and accurate, and you will notify us in writing promptly when any correction to the content becomes necessary. You shall promptly modify at our request the content of any Internet marketing material for the Facility you use, authorize, display or provide to conform to System Standards. You will discontinue any Internet marketing that conflicts, in our reasonable discretion, with Chain-wide Internet marketing activities. You must honor the terms of any participation agreement you sign for Internet marketing. You shall pay when due any fees, commissions, charges and reimbursements relating to Internet marketing activities (i) in which you agree to participate, or (ii) that we designate as mandatory on a Chain-wide basis, provided that the activities carry aggregate fees per transaction of not more than the sum of the full agent commission specified on Schedule C for sales agents, plus 10% of the Chain's reported average daily rate for the preceding calendar year. We may suspend the Facility's participation in Internet marketing activity if you default under this Agreement.

3.7 **Governmental Matters.** You will obtain as and when needed all governmental permits, licenses and consents required by law to construct, acquire, renovate, operate and maintain the Facility and to offer all services you advertise or promote. You will pay when due or properly contest all federal, state and local payroll, withholding, unemployment, beverage, permit, license, property, ad valorem and other taxes, assessments, fees, charges, penalties and interest, and will file when due all governmental returns, notices and other filings. You will comply with all applicable federal, state and local laws, regulations and orders applicable to you and/or the Facility, including those combating terrorism such as the USA Patriot Act and Executive Order 13224.

3.8 **Financial Books & Records; Audits.**

3.8.1  The Facility's transactions must be timely and accurately recorded in accounting books and records prepared on an accrual basis compliant with generally accepted accounting principles of the United States ("GAAP") and consistent with the most recent edition of the Uniform System of Accounts for the Lodging Industry published by the American Hotel & Motel Association, as modified by this Agreement and System Standards. You acknowledge that your accurate accounting for and reporting of Gross Room Revenues is a material obligation you accept under this Agreement.

3.8.2  Upon our request, you will send to us copies of financial statements, tax returns, and other records relating to the Facility for the applicable accounting period that we require under this Agreement and System Standards. We may notify you of a date on which we propose to audit the Facility's books and records at the Facility. You will be deemed to confirm our proposed date unless you follow the instructions with the audit notice for changing the date. You need to inform us where the books and records will be produced. You need to produce for our auditors at the confirmed time and place for the audit the books, records, tax returns and financial statements for the Facility. We may also perform an audit of the Facility's books and records without advance notice. Your staff must cooperate with and assist our auditors to perform any audit we conduct.

3.8.3 We will notify you in writing if you default under this Agreement because (i) you do not cure a violation of Section 3.8.2 within 30 days after the date of the initial audit, (ii) you cancel 2 or more previously scheduled audits, (iii) you refuse to admit our auditors during normal business hours at the place where you maintain the Facility's books and records, or refuse to produce the books and records at the audit or send them to us as required under this Agreement and System Standards for the applicable accounting periods, (iv) our audit determines that the books and records you produced are incomplete or show evidence of tampering or violation of generally accepted internal control procedures, or (v) our audit determines that that you have reported to us less than 97% of the Facility's Gross Room Revenues for any fiscal year preceding the audit. Our notice of default may include, in our sole discretion and as part of your performance needed to cure the default under this Section 3.8, an "Accounting Procedure Notice." You must also pay any deficiency in Recurring Fees, any Audit Fee we assess you for your default of Section 3.8 as described in Section 4.8 and/or other charges we identify and invoice as a result of the audit. The Accounting Procedure Notice requires that you obtain and deliver to us, within 90 days after the end of each of your next three fiscal years ending after the Accounting Procedure Notice, an audit opinion signed by an independent certified public accountant who is a member of the American Institute of Certified Public Accountants addressed to us that the Facility's Gross Room Revenues you reported to us during the fiscal year fairly present the Gross Room Revenues of the Facility computed in accordance with this Agreement for the fiscal year.

3.9 **Inspections.** You acknowledge that the Facility's participation in our quality assurance inspection program (including unannounced inspections) is a material obligation you accept under this Agreement. You will permit our representatives to perform quality assurance inspections of the Facility at any time with or without advance notice. The inspections will commence during normal business hours although we may observe Facility operation at any time. You and the Facility staff will cooperate with the inspector performing the inspection. If the Facility fails an inspection, you refuse to cooperate with our inspector, or you refuse to comply with our published inspection System Standards, then you will pay us when invoiced for any Reinspection Fee specified in System Standards Manuals plus the reasonable travel, lodging and meal costs our inspector incurs for a reinspection. You will also be charged the Reinspection Fee if we are required to return to the Facility to inspect it as a result of your failure to complete any Improvement Obligation by the deadline established in the Punch List, as set forth in Section 3.1. We may also conduct paper and electronic customer satisfaction surveys of your guests and include the results in your final quality assurance score. We may publish and disclose the results of quality assurance inspections and guest surveys.

3.10 **Insurance.** You will obtain and maintain during the Term of this Agreement the insurance coverage required under the System Standards Manual from insurers meeting the standards established in the Manual. Unless we instruct you otherwise, your liability insurance policies will name Ramada Worldwide, Inc., Wyndham Worldwide Corporation, Wyndham Hotel Group, LLC, their current and former affiliates, successors and assigns as additional insureds.

3.11 **Conferences.** You or your representative will attend each annual RINA conference and pay the Conference Registration Fee described in Section 2.2. Mandatory recurrent training for licensees and general managers described in Section 4.1.4 may be held at a RINA conference.

The Fee will be the same for all Chain Facilities that we license in the United States.  You will receive reasonable notice of a Chain conference.

3.12  **Purchasing.**  You will purchase or obtain certain items we designate as proprietary or that bear or depict the Marks only from suppliers we approve.  You must lease your exterior signage face plates from our approved leasing company.  You may purchase or lease other items for the Facility from any competent source you select, so long as the items meet or exceed System Standards.

3.13  **Good Will.**  You will use reasonable efforts to protect, maintain and promote the name "Ramada" and its distinguishing characteristics, and the other Marks.  You will not permit or allow your officers, directors, principals, employees, representatives, or guests of the Facility to engage in conduct which is unlawful or damaging to the good will or public image of the Chain or System.  You will participate in Chain-wide guest service and satisfaction guaranty programs we require in good faith for all Chain Facilities.  You will follow System Standards for identification of the Facility and for you to avoid confusion on the part of guests, creditors, lenders, investors and the public as to your ownership and operation of the Facility, and the identity of your owners.

3.14  **Facility Modifications.**  You may materially modify, diminish or expand the Facility (or change its interior design, layout, FF&E, or facilities) only after you receive our prior written consent, which we will not unreasonably withhold or delay.  You will pay our Rooms Addition Fee then in effect for each guest room you add to the Facility.  If we so request, you will obtain our prior written approval of the plans and specifications for any material modification, which we will not unreasonably withhold or delay.  You will not open to the public any material modification until we inspect it for compliance with the Approved Plans and System Standards.

3.15  **Courtesy Lodging.**  You will provide lodging at the "Employee Rate" established in the System Standards Manual from time to time (but only to the extent that adequate room vacancies exist) to our representatives traveling on business, but not more than three standard guest rooms at the same time.

3.16  **Minor Renovations.**  Beginning three years after the Opening Date, we may issue a "Minor Renovation Notice" to you that will specify reasonable Facility upgrading and renovation requirements (a "Minor Renovation") to be commenced no sooner than 60 days after the notice is issued, having an aggregate cost for labor, FF&E and materials estimated by us to be not more than the Minor Renovation Ceiling Amount.  You will perform the Minor Renovations as and when the Minor Renovation Notice requires.  We will not issue a Minor Renovation Notice within three years after the date of a prior Minor Renovation Notice, or if the three most recent quality assurance inspection scores of the Facility averaged no more than 125 points and the most recent quality assurance inspection score for the Facility was no more than 150 points (or equivalent scores under a successor quality assurance scoring system we employ),  when the Facility is otherwise eligible for a Minor Renovation.

**4.  Our Operating and Service Obligations.**  We will provide you with the following services and assistance:

**4.1  Training.**  We may offer (directly or indirectly by subcontracting with an affiliate or a third party) general manager and owner orientation training, remedial training and supplemental training.

**4.1.1 General Manager Orientation Training.**  We will offer at a location in the United States we designate a general manager orientation training program.  The program will not exceed two weeks in duration and will cover such topics as System Standards, services available from us, and operating a Chain Facility.  We may also offer certain Internet-based training as a supplement to the classroom training experience.  Your initial general manager (or other representative who exercises day to day operational authority) for the Facility must complete this program to our satisfaction no later than 90 days after the Opening Date.  Any replacement general manager must complete general manager orientation to our satisfaction within 90 days after he/she assumes the position. If we do not offer a place in general manager orientation within the above time frame, your replacement general manager must attend the next program held at which we offer a place. Your general manager for the Facility must complete general manager orientation even if you employ managers at other Chain Facilities who have already received this training.  We charge you tuition for general manager orientation which is payable before the scheduled date of the program.  The tuition for your first general manager is $1,250 if he/she attends orientation within the time period required under this section.  For any replacement general manager, you must pay the tuition in effect for the program when your manager attends the program. You must also pay for your manager's travel, lodging, meals, incidental expenses, compensation and benefits.  We may, at our option, automatically schedule your initial or replacement general manager for a class to be held within the required time period (an "auto-assigned class") and invoice you when we notify you about the date of the class.  If your general manager is unable to attend that class, you must notify us at least 15 days before the training start date and re-schedule the general manager for another class to be held within the 90 day period.  We may charge you "No-Show Fees" or "Cancellation Fees" if your general manager fails to attend orientation within the required time period or fails to attend a program we have scheduled for him or her without giving us at least 15 days notice of cancellation. This is in addition to the tuition you must pay us for your general manager at the then in effect rate when he/she attends orientation. See Section 4.1.5.

**4.1.2 Owner Orientation Training.**  We will offer an owner orientation training program to familiarize you with the System, the Chain, and our services.   If this is your first System license, you (or a person with executive authority if you are an entity) must attend owner orientation preferably within 60 days before, but no later than 60 days after, the Opening Date.  If we do not offer a place in owner orientation within this time period, you must attend the next program held at which we offer a place.  Financial institutions and real estate mortgage investment conduits are exempt from the obligation to attend owner orientation, but may choose to do so at their option. We charge you tuition of $825 which is payable before the scheduled date for the program.  You must also pay for your travel, lodging, meal and incidental expenses. If you are unable to attend an orientation program that you have scheduled with us, you must notify us at least 15 days before the start date and schedule attendance at another class to be held within the 90 day period. We may charge you No-Show or Cancellation Fees if you fail to attend any mandatory orientation program within the required time period or fail to attend a program we have scheduled for you without giving us at least 15 days notice of cancellation. See Section 4.1.5.

**4.1.3  Remedial Training.** We may require you, your general manager and/or your staff to participate in remedial training if the Facility fails multiple quality assurance inspections and/or experiences significant complaints to our guest services department, as a condition to avoiding termination or to resumption of reservation service. This training may be offered at our corporate offices, at a regional location, on-line, or at the Facility. You must pay the tuition in effect for this program when it is offered to you. If the training is provided at the Facility, you must provide lodging for our trainers. Tuition for remedial training must be paid before the training commences. The length of the remedial training could be up to five days, depending on the severity of the quality assurance and/or customer service issues.

**4.1.4  Supplemental Training.** We may offer other mandatory or optional training programs for reasonable tuition or without charge. This training could be offered in our U.S. training center or other locations or held in conjunction with a Chain lodging conference. You will pay for your representative's travel, lodging, meals, incidental expenses, compensation and benefits and any tuition charge we establish for this training. We may offer, rent or sell to you video tapes, computer discs or other on-site training aids and materials, or require you to buy them at reasonable prices. We may also offer Internet-based training via the Chain's intranet website.

**4.1.5  No-Show and Cancellation Fees.** If you or your general manager fails to attend orientation within the required time period, or fails to attend a training program as scheduled (including any auto-assigned class) without notifying us in advance, we may charge you a No-Show Fee of up to 100% of the tuition for the program. If you or any other member of your staff cancel participation in any training program less than 15 days before it is scheduled to be held, we may charge you a Cancellation Fee of up to 50% of the tuition for the program as we establish from time to time. No-Show and Cancellation Fees are in addition to the tuition you will have to pay at the then offered rate when you or your general manager attends the program. We may assess you additional No-Show or Cancellation Fees for continued failures by you under Section 4.1.

**4.2  Reservation System.** We will operate and maintain (directly or by subcontracting with an affiliate or one or more third parties), with funds allocated from the collections of the RINA Services Assessment Fees, a computerized Reservation System or such technological substitute(s) as we determine, in our discretion. We will use the allocated RINA Services Assessment Fees for the acquisition, development, support, equipping, maintenance, improvement and operation of the Reservation System. We will provide software maintenance for the software we license to you to connect to the Reservation System if you are up to date in your payment of Recurring Fees and all other fees you must pay under any other agreement with us or our affiliate. The Facility will participate in the Reservation System, commencing with the Opening Date for the balance of the Term. We have the right to provide reservation services to lodging facilities other than Chain Facilities or to other parties. We will not offer callers to our general consumer toll free reservation telephone number in the United States the opportunity to make reservations for other lodging chains.

**4.3  Marketing.**

4.3.1  We will promote public awareness and usage of Chain Facilities with funds allocated from collections of the RINA Services Assessment Fees by implementing advertising, promotion, publicity, market research and other marketing programs, training programs and related activities, and the production and distribution of Chain publications and directories of hotels. We will determine in our discretion: (i) The nature and type of media placement; (ii) The allocation (if any) among international, national, regional and local markets; and (iii) The nature and type of advertising copy, other materials and programs.   We or an affiliate may be reimbursed from RINA Services Assessment Fees for the reasonable direct and indirect costs, overhead or other expenses of providing marketing services.  We are not obligated to supplement or advance funds available from collections of the RINA Services Assessment Fees to pay for marketing activities.   We do not promise that the Facility or you will benefit directly or proportionately from marketing activities.

4.3.2  We may, at our discretion, implement special international, national, regional or local promotional programs (which may or may not include the Facility) and may make available to you (to use at your option) media advertising copy and other marketing materials for prices which reasonably cover the materials' direct and indirect costs.

4.3.3  We will publish the Chain Directory.  We will include the Facility in the Chain Directory after it opens if you submit the information we request on time, and you are not in default under this Agreement at the time we must arrange for publication.  We will supply Directories to you for display at locations specified in the System Standards Manual or policy statements.  We may assess you a reasonable charge for the direct and indirect expenses (including overhead) of producing and delivering the Directories.

4.4  **Purchasing and Other Services.**  We may offer optional assistance to you with purchasing items used at or in the Facility.  Our affiliates may offer this service on our behalf.  We may restrict the vendors authorized to sell proprietary or Mark-bearing items in order to control quality, provide for consistent service or obtain volume discounts.  We will maintain and provide to you lists of suppliers approved to furnish Mark-bearing items, or whose products conform to System Standards.  We may offer optional architectural and design services for the Facility for a separate fee.

4.5  **The System.**  We will control and establish requirements for all aspects of the System.  We may, in our discretion, change, delete from or add to the System, including any of the Marks or System Standards, in response to changing market conditions.  We may, in our discretion, permit deviations from System Standards, based on local conditions and our assessment of the circumstances.

4.6  **Consultations and Standards Compliance.**  We will assist you to understand your obligations under System Standards by telephone, mail, during quality assurance inspections, through the System Standards Manual, at training sessions and during conferences and meetings we conduct.   We will provide telephone and mail consultation on Facility operation and marketing through our representatives.  We will offer you access to any Internet website we may maintain to provide Chain licensees with information and services, subject to any rules, policies

and procedures we establish for its use and access and to this Agreement. We may limit or deny access to any such website while you are in default under this Agreement.

**4.7 System Standards Manual and Other Publications.** We will specify System Standards in the System Standards Manual, policy statements or other publications. We will lend you one copy of the System Standards Manual promptly after we sign this Agreement. We will send you any System Standards Manual revisions and/or supplements as and when issued. We will send you all other publications for Chain licensees and all separate policy statements in effect from time to time.

**4.8 Inspections and Audits.** We have the unlimited right to conduct unannounced quality assurance inspections of the Facility and its operations, records and Mark usage to test the Facility's compliance with System Standards and this Agreement, and the audits described in Section 3.8. We have the unlimited right to reinspect if the Facility does not achieve the score required on an inspection. We may impose a reinspection fee and will charge you for our costs as provided in Section 3.9. You will pay us an "Audit Fee" of $1,000.00 when we invoice you for an Audit Fee under Section 3.8. We may increase the Audit Fee on a Chain-wide basis to cover any increases in our audit costs, but not more than 5% per year on a cumulative basis. Our inspections are solely for the purposes of checking compliance with System Standards.

**5. Term.** The Term begins on the Effective Date and expires at the end of the fifteenth License Year. Some of your duties and obligations will survive termination or expiration of this Agreement. NEITHER PARTY HAS RENEWAL RIGHTS OR OPTIONS.

**6. Application and Initial Fees.** We should receive from you a non-refundable Application Fee of $1,000.00. You will pay us a non-refundable Initial Fee in the amount of $17,500.00 when you sign this Agreement, which is fully earned when we sign this Agreement.

**7. Recurring Fees, Taxes and Interest.**

7.1 You will pay us certain "Recurring Fees" in U.S. dollars (or such other currency as we may direct if the Facility is outside the United States). The Royalty and RINA Services Assessment Fees described in this Section 7.1 are payable fifteen days after the month in which they accrue, without billing or demand. Other Recurring Fees are payable at the time set forth in the System Standards. Recurring Fees include the following:

7.1.1 A "Royalty" equal to four percent (4.0%) of Gross Room Revenues of the Facility accruing during the calendar month, accrues from the earlier of the Opening Date or the date you identify the Facility as a Chain Facility or operate it under a Mark until the end of the Term.

7.1.2 A "RINA Services Assessment Fee" as set forth in Schedule C for advertising, marketing, training, the Reservation System and other related services and programs, accrues from the Opening Date until the end of the Term, including during suspension periods. On behalf of RINA, we collect and deposit the Fees from licensees, then disburse and administer the funds collected by means of a separate account or accounts. The RINA Services Assessment Fee is subject to change for all Chain Facilities, and new fees and charges may be assessed for new

services, by substituting a new Schedule C or otherwise, but only upon the recommendation of the RINA Executive Committee and after our approval. You will also pay or reimburse us for travel and other agent commissions paid for certain reservations at the Facility and a "GDS Fee" levied to pay for reservations for the Facility originated or processed through the Global Distribution System, the Internet and other reservation systems and networks. We may charge a reasonable service fee for this service. We may charge Facilities using the Reservation System outside the United States for reservation service using a different formula. We may use the RINA Services Assessment Fees we collect, in whole or in part, to reimburse our reasonable direct and indirect costs, overhead or other expenses of providing marketing, training and reservation services.

7.2  You will pay to us "Taxes" equal to any federal, state or local sales, gross receipts, use, value added, excise or similar taxes assessed against us on the Recurring Fees by the jurisdictions where the Facility is located, but not including any income tax, franchise or other tax for the privilege of doing business by us in your State. You will pay Taxes to us when due.

7.3  "Interest" is payable when you receive our invoice on any past due amount payable to us under this Agreement at the rate of 1.5% per month or the maximum rate permitted by applicable law, whichever is less, accruing from the due date until the amount is paid.

7.4  If a transfer occurs, your transferee or you will pay us our then current Application Fee and a "Relicense Fee" equal to the Initial Fee we would then charge a new licensee for the Facility.

**8. Indemnifications.**

8.1  Independent of your obligation to procure and maintain insurance, you will indemnify, defend and hold the Indemnitees harmless, to the fullest extent permitted by law, from and against all Losses and Expenses, incurred by any Indemnitee for any investigation, claim, action, suit, demand, administrative or alternative dispute resolution proceeding, relating to or arising out of any transaction, occurrence or service at, or involving the operation of, the Facility, any payment you make or fail to make to us, any breach or violation of any contract or any law, regulation or ruling by, or any act, error or omission (active or passive) of, you, any party associated or affiliated with you or any of the owners, officers, directors, employees, agents or contractors of you or your affiliates, including when you are alleged or held to be the actual, apparent or ostensible agent of the Indemnitee, or the active or passive negligence of any Indemnitee is alleged or proven. You have no obligation to indemnify an Indemnitee for damages to compensate for property damage or personal injury if a court of competent jurisdiction makes a final decision not subject to further appeal that the Indemnitee engaged in willful misconduct or intentionally caused such property damage or bodily injury. This exclusion from the obligation to indemnify shall not, however, apply if the property damage or bodily injury resulted from the use of reasonable force by the Indemnitee to protect persons or property.

8.2  You will respond promptly to any matter described in the preceding paragraph, and defend the Indemnitee. You will reimburse the Indemnitee for all costs of defending the matter, including reasonable attorneys' fees, incurred by the Indemnitee if your insurer or you do not

assume defense of the Indemnitee promptly when requested, or separate counsel is appropriate, in our discretion, because of actual or potential conflicts of interest. We must approve any resolution or course of action in a matter that could directly or indirectly have any adverse effect on us or the Chain, or could serve as a precedent for other matters.

8.3   We will indemnify, defend and hold you harmless, to the fullest extent permitted by law, from and against all Losses and Expenses incurred by you in any action or claim arising from your proper use of the System alleging that your use of the System and any property we license to you is an infringement of a third party's rights to any trade secret, patent, copyright, trademark, service mark or trade name. You will promptly notify us in writing when you become aware of any alleged infringement or an action is filed against you. You will cooperate with our defense and resolution of the claim. We may resolve the matter by obtaining a license of the property for you at our expense, or by requiring that you discontinue using the infringing property or modify your use to avoid infringing the rights of others.

## 9.  Your Assignments, Transfers and Conveyances.

9.1   **Transfer of the Facility.** This Agreement is personal to you (and your owners if you are an entity). We are relying on your experience, skill and financial resources (and that of your owners and the guarantors, if any) to sign this Agreement with you. You may finance the Facility and grant a lien, security interest or encumbrance on it without notice to us or our consent. If a Transfer is to occur, the transferee or you must comply with Section 9.3. Your License is subject to termination when the Transfer occurs. The License is not transferable to your transferee, who has no right or authorization to use the System and the Marks when you transfer ownership or possession of the Facility. The transferee may not operate the Facility under the System, and you are responsible for performing the post-termination obligations in Section 13. You and your owners may, only with our prior written consent and after you comply with Sections 9.3 and 9.6, assign, pledge, transfer, delegate or grant a security interest in all or any of your rights, benefits and obligations under this Agreement, as security or otherwise. Transactions involving Equity Interests that are not Equity Transfers do not require our consent and are not Transfers.

9.2   **Public Offerings and Registered Securities.** You may engage in the first registered public offering of your Equity Interests only after you pay us a public offering fee equal to $15,000. Your Equity Interests (or those of a person, parent, subsidiary, sibling or affiliate entity, directly or indirectly effectively controlling you), are freely transferable without the application of this Section if they are, on the Effective Date, or after the public offering fee is paid, they become, registered under the federal Securities Act of 1933, as amended, or a class of securities registered under the Securities Exchange Act of 1934, as amended, or listed for trading on a national securities exchange or the automated quotation system of the National Association of Securities Dealers, Inc. (or any successor system), provided that any tender offer for at least a majority of your Equity Interests will be an Equity Transfer subject to Section 9.1.

9.3   **Conditions.** We may, to the extent permitted by applicable law, condition and withhold our consent to a Transfer when required under this Section 9 until the transferee and you meet certain conditions. If a Transfer is to occur, the transferee (or you, if an Equity Transfer is

involved) must first complete and submit our Application, qualify to be a licensee in our sole discretion, given the circumstances of the proposed Transfer, provide the same supporting documents as a new license applicant, pay the Application and Relicense Fees then in effect, sign the form of License Agreement we then offer in conversion transactions and agree to renovate the Facility as if it were an existing facility converting to the System, as we reasonably determine. We will provide a Punch List of improvements we will require after the transferee's Application is submitted to us. We may require structural changes to the Facility if it no longer meets System Standards for entering conversion facilities or, in the alternative, condition our approval of the Transfer on one or more of the following: limit the transferee's term to the balance of your Term, add a right to terminate without cause exercisable by either party after a period of time has elapsed, or allow you to terminate the License when you sell the Facility and pay us Liquidated Damages under Section 12.1 at the same rate as you would pay if the termination occurred before the Opening Date. Such payment would be due and payable when you transfer possession of the Facility. We must also receive general releases from you and each of your owners, and payment of all amounts then owed to us and our affiliates by you, your owners, your affiliates, the transferee, its owners and affiliates, under this Agreement or otherwise. Our consent to the transaction will not be effective until these conditions are satisfied.

9.4  **Permitted Transferee Transactions.**  You may transfer an Equity Interest or effect an Equity Transfer to a Permitted Transferee without obtaining our consent, renovating the Facility or paying a Relicense Fee or Application Fee. No Transfer will be deemed to occur. You also must not be in default and you must comply with the application and notice procedures specified in Sections 9.3 and 9.6. Each Permitted Transferee must first agree in writing to be bound by this Agreement, or at our option, execute the License Agreement form then offered prospective licensees. No transfer to a Permitted Transferee shall release a living transferor from liability under this Agreement or any guarantor under any Guaranty of this Agreement. You must comply with this Section if you transfer the Facility to a Permitted Transferee. A transfer resulting from a death may occur even if you are in default under this Agreement.

9.5  **Attempted Transfers.**  Any transaction requiring our consent under this Section 9 in which our consent is not first obtained shall be void, as between you and us. You will continue to be liable for payment and performance of your obligations under this Agreement until we terminate this Agreement, all your financial obligations to us are paid and all System identification is removed from the Facility.

9.6  **Notice of Transfers.**  You will give us at least 30 days prior written notice of any proposed Transfer or Permitted Transferee transaction. You will notify us when you sign a contract to Transfer the Facility and 10 days before you intend to close on the transfer of the Facility. We will respond to all requests for our consent and notices of Permitted Transferee transactions within a reasonable time not to exceed 30 days. You will notify us in writing within 30 days after a change in ownership of 25% or more of your Equity Interests that are not publicly held or that is not an Equity Transfer, or a change in the ownership of the Facility if you are not its owner. You will provide us with lists of the names, addresses, and ownership percentages of your owner(s) at our request.

**10. Our Assignments.** We may assign, delegate or subcontract all or any part of our rights and duties under this Agreement, including by operation of law, without notice and without your consent. We will have no obligations to you after you are notified that our transferee has assumed our obligations under this Agreement except those that arose before we assign this Agreement.

**11. Default and Termination.**

11.1  **Default.** In addition to the matters identified in Sections 3.1 and 3.8, you will be in default under this Agreement if (a) you do not pay us when a payment is due under this Agreement or any other instrument, debt, agreement or account with us related to the Facility, (b) you do not perform any of your other obligations when this Agreement and the System Standards Manual require, or (c) if you otherwise breach this Agreement. If your default is not cured within ten days after you receive written notice from us that you have not filed your monthly report, paid us any amount that is due or breached your obligations regarding Confidential Information, or within 30 days after you receive written notice from us of any other default (except as noted below), then we may terminate this Agreement by written notice to you, under Section 11.2. We will not exercise our right to terminate if you have completely cured your default, or until any waiting period required by law has elapsed. In the case of quality assurance default, if you have acted diligently to cure the default but cannot do so and have entered into a written improvement agreement with us within 30 days after the failing inspection, you may cure the default within 90 days after the failing inspection. We may terminate the License if you do not perform that improvement agreement.

11.2  **Termination.** We may terminate the License, or this Agreement if the Opening Date has not occurred, effective when we send written notice to you or such later date as required by law or as stated in the default notice, when (1) you do not cure a default as provided in Section 11.1 or we are authorized to terminate under Section 3.1, (2) you discontinue operating the Facility as a "Ramada", (3) you do or perform, directly or indirectly, any act or failure to act that in our reasonable judgment is or could be injurious or prejudicial to the goodwill associated with the Marks or the System, (4) you lose possession or the right to possession of the Facility, (5) you (or any guarantor) suffer the termination of another license or License Agreement with us or one of our affiliates, (6) you intentionally maintain false books and records or submit a materially false report to us, (7) you (or any guarantor) generally fail to pay debts as they come due in the ordinary course of business, (8) you, any guarantor or any of your owners or agents misstated to us or omitted to tell us a material fact to obtain or maintain this Agreement with us, (9) you receive two or more notices of default from us in any one year period (whether or not you cure the defaults), (10) a violation of Section 9 occurs, or a Transfer occurs before the relicensing process is completed, (11) you or any of your Equity Interest owners contest in court the ownership or right to franchise or license all or any part of the System or the validity of any of the Marks, (12) you, any guarantor or the Facility is subject to any voluntary or involuntary bankruptcy, liquidation, dissolution, receivership, assignment, reorganization, moratorium, composition or a similar action or proceeding that is not dismissed within 60 days after its filing, or (13) you maintain or operate the Facility in a manner that endangers the health or safety of the Facility's guests.

### 11.3 Casualty and Condemnation.

11.3.1  You will notify us promptly after the Facility suffers a Casualty that prevents you from operating in the normal course of business, with less than 75% of guest rooms available.  You will give us information on the availability of guest rooms and the Facility's ability to honor advance reservations.  You will tell us in writing within 60 days after the Casualty whether or not you will restore, rebuild and refurbish the Facility to conform to System Standards and its condition prior to the Casualty.  This restoration will be completed within 180 days after the Casualty.  You may decide within the 60 days after the Casualty, and if we do not hear from you, we will assume that you have decided, to terminate this Agreement, effective as of the date of your notice or 60 days after the Casualty, whichever comes first.  If this Agreement so terminates, you will pay all amounts accrued prior to termination and follow the post-termination requirements in Section 13.  You will not be obligated to pay Liquidated Damages if the Facility will no longer be used as an extended stay or transient lodging facility after the Casualty.

11.3.2  You will notify us in writing within 10 days after you receive notice of any proposed Condemnation of the Facility, and within 10 days after receiving notice of the Condemnation date.  This Agreement will terminate on the date the Facility or a substantial portion is conveyed to or taken over by the condemning authority.

11.4  **Our Other Remedies.**  We may suspend the Facility from the Reservation System for any default or failure to pay or perform under this Agreement or any other written agreement with us relating to the Facility, discontinue Reservation System referrals to the Facility for the duration of such suspension, and may divert previously made reservations to other Chain Facilities after giving notice of non-performance, non-payment or default.  All RINA Services Assessment Fees and related Reservation System user fees accrue during the suspension period.  We may deduct points under our quality assurance inspection program for your failure to comply with this Agreement or System Standards.  Reservation service will be restored after you have fully cured any and all defaults and failures to pay and perform.  We may charge you, and you must pay as a condition precedent to restoration of reservation service, a Service Interruption Fee specified on Schedule C to reimburse us for our costs associated with service suspension and restoration.  We may omit the Facility from the Directory if you are in default on the date we must determine which Chain Facilities are included in the Directory.  You recognize that any use of the System not in accord with this Agreement will cause us irreparable harm for which there is no adequate remedy at law, entitling us to injunctive and other relief.  We may litigate to collect amounts due under this Agreement without first issuing a default or termination notice.  Our consent or approval may be withheld if needed while you are in default under this Agreement or may be conditioned on the cure of all your defaults.

11.5  **Your Remedies.**  If we fail to issue our approval or consent as and when required under this Agreement within a reasonable time of not less than 30 days after we receive all of the information we request, and you believe our refusal to approve or consent is wrongful, you may bring a legal action against us to compel us to issue our approval or consent to the obligation.  To the extent permitted by applicable law, this action shall be your exclusive remedy.  We shall not be responsible for direct, indirect, special, consequential or exemplary damages, including, but not limited to, lost profits or revenues.

## 12. Liquidated Damages.

12.1 Generally. If we terminate the License under Section 11.2, or you terminate this Agreement (except under Section 11.3 or as a result of our default which we do not cure within a reasonable time after written notice), you will pay us Liquidated Damages within 30 days following the date of Termination. If Termination occurs during the last two License Years of the Term, Liquidated Damages will be the lesser of (i) the amount specified in Section 18.4, or (ii) the average daily fees based on a percentage of Gross Room Revenues accruing under Section 7.1 during the 12 full calendar months preceding the month in which Termination occurs multiplied by the number of days remaining in the unexpired Term (the "Ending Period") at the date of Termination. You will also pay any applicable Taxes assessed on such payment. Before the last two License Years, Liquidated Damages will be **as set forth in Section 18.4.** If we terminate this Agreement before the Opening Date, you will pay us within 10 days after you receive our notice of termination Liquidated Damages equal to one-half the amount payable after the Opening Date. Liquidated Damages are paid in place of our claims for lost future Recurring Fees under this Agreement. Our right to receive other amounts due under this Agreement is not affected.

12.2 **Condemnation Payments.** In the event a Condemnation is to occur, you will pay us the fees set forth in Section 7 for a period of one year after we receive the initial notice of condemnation described in Section 11.3.2, or until the Condemnation occurs, whichever is longer. You will pay us Liquidated Damages equal to the average daily Royalties and RINA Services Assessment Fees for the one year period preceding the date of your condemnation notice to us multiplied by the number of days remaining in the one year notice period if the Condemnation is completed before the one year notice period expires. This payment will be made within 30 days after Condemnation is completed (when you close the Facility or you deliver it to the condemning authority). You will pay no Liquidated Damages if the Condemnation is completed after the one year notice period expires, but the fees set forth in Section 7 must be paid when due until Condemnation is completed.

## 13. Your Duties At and After Termination. When the License or this Agreement terminates for any reason whatsoever:

13.1 **System Usage Ceases.** You will immediately stop using the System to operate and identify the Facility. You will remove all signage and other items bearing any Marks and follow the other steps detailed in the System Standards Manual for changing the identification of the Facility. You will promptly paint over or remove the Facility's distinctive System trade dress, color schemes and architectural features. You shall not identify the Facility with a confusingly similar mark or name, or use the same colors as the System trade dress for signage, printed materials and painted surfaces. You will cease all Internet marketing using any Marks to identify the Facility.

13.2 **Other Duties.** You will pay all amounts owed to us under this Agreement within 10 days after termination. You will owe us Recurring Fees on Gross Room Revenues accruing while the Facility is identified as a "Ramada", including the RINA Services Assessment Fees for so long as the Facility receives service from the Reservation System. We may immediately remove the

Facility from the Reservation System and divert reservations as authorized in Section 11.4. We may notify third parties that the Facility is no longer associated with the Chain. We may also, to the extent permitted by applicable law, and without prior notice enter the Facility and any other parcels, remove software (including archive and back-up copies) for accessing the Reservation System, all copies of the System Standards Manual, Confidential Information, equipment and all other personal property of ours, and paint over or remove and purchase for $10.00, all or part of any interior or exterior Mark-bearing signage (or signage face plates), including billboards, whether or not located at the Facility, that you have not removed or obliterated within five days after termination. You will promptly pay or reimburse us for our cost of removing such items, net of the $10.00 purchase price for signage. We will exercise reasonable care in removing or painting over signage. We will have no obligation or liability to restore the Facility to its condition prior to removing the signage. We shall have the right, but not the obligation, to purchase some or all of the Facility's Mark-bearing FF&E and supplies at the lower of their cost or net book value, with the right to set off their aggregate purchase price against any sums then owed us by you.

13.3 **Advance Reservations.** The Facility will honor any advance reservations, including group bookings, made for the Facility prior to termination at the rates and on the terms established when the reservations are made and pay when due all related travel agent commissions.

13.4 **Survival of Certain Provisions.** Sections 3.8 (as to audits, for 2 years after termination), 3.13, 7 (as to amounts accruing through termination), 8, 11.4, 12, 13, 15, 16 and 17 survive termination of the License and this Agreement, whether termination is initiated by you or us, even if termination is wrongful.

**14. Your Representations and Warranties.** You expressly represent and warrant to us as follows:

14.1 **Quiet Enjoyment and Financing.** You own, or will own prior to commencing improvement, or lease, the Location and the Facility. You will be entitled to possession of the Location and the Facility during the entire Term without restrictions that would interfere with your performance under this Agreement, subject to the reasonable requirements of any financing secured by the Facility. You have, when you sign this Agreement, and will maintain during the Term, adequate financial liquidity and financial resources to perform your obligations under this Agreement.

14.2 **This Transaction.** You and the persons signing this Agreement for you have full power and authority and have been duly authorized, to enter into and perform or cause performance of your obligations under this Agreement. You have obtained all necessary approvals of your owners, Board of Directors and lenders. No executory franchise, license, or affiliation agreement for the Facility exists other than this Agreement. Your execution, delivery and performance of this Agreement will not violate, create a default under or breach of any charter, bylaws, agreement or other contract, license, permit, indebtedness, certificate, order, decree or security instrument to which you or any of your principal owners is a party or is subject or to which the Facility is subject. Neither you nor the Facility is the subject of any current or pending merger, sale, dissolution, receivership, bankruptcy, foreclosure, reorganization,

RAMEXC1
216571 03/07

17

insolvency, or similar action or proceeding on the date you execute this Agreement and was not within the three years preceding such date, except as disclosed in the Application. You will submit to us the documents about the Facility, you, your owners and your finances that we request in the License Application (or after our review of your initial submissions) before or within 30 days after you sign this Agreement. To the best of your knowledge, neither you, your owners (if you are an entity), your officers, directors or employees or anyone else affiliated or associated with you, whether by common ownership, by contract, or otherwise, has been designated as, or is, a terrorist, a "Specially Designated National" or a "Blocked Person" under U.S. Executive Order 13224, in lists published by the U.S. Department of the Treasury's Office of Foreign Assets Control, or otherwise.

14.3 **No Misrepresentations or Implied Covenants.** All written information you submit to us about the Facility, you, your owners, any guarantor, or the finances of any such person or entity, was or will be at the time delivered and when you sign this Agreement, true, accurate and complete, and such information contains no misrepresentation of a material fact, and does not omit any material fact necessary to make the information disclosed not misleading under the circumstances. There are no express or implied covenants or warranties, oral or written, between we and you except as expressly stated in this Agreement.

## 15. Proprietary Rights.

15.1 **Marks and System.** You will not acquire any interest in or right to use the System or Marks except under this Agreement. You will not apply for governmental registration of the Marks, or use the Marks or our corporate name in your legal name, but you may use a Mark for an assumed business or trade name filing.

15.2 **Inurements.** All present and future distinguishing characteristics, improvements and additions to or associated with the System by us, you or others, and all present and future service marks, trademarks, copyrights, service mark and trademark registrations used and to be used as part of the System, and the associated good will, shall be our property and will inure to our benefit. No good will shall attach to any secondary designator that you use.

15.3 **Other Locations and Systems.** We and our affiliates each reserve the right to own, in whole or in part, and manage, operate, use, lease, finance, sublease, franchise, license (as licensor or licensee), provide services to or joint venture (i) distinctive separate lodging or food and beverage marks and other intellectual property which are not part of the System, and to enter into separate agreements with you or others (for separate charges) for use of any such other marks or proprietary rights, (ii) other lodging, food and beverage facilities, or businesses, under the System utilizing modified System Standards, and (iii) a Chain Facility at or for any location outside the Protected Territory defined in Section 17.8. You acknowledge that we are affiliated with or in the future may become affiliated with other lodging providers or franchise systems that operate under names or marks other than the Marks. We and our affiliates may use or benefit from common hardware, software, communications equipment and services and administrative systems for reservations, franchise application procedures or committees, marketing and advertising programs, personnel, central purchasing, approved supplier lists, franchise sales personnel (or independent franchise sales representatives), etc.

15.4 **Confidential Information.** You will take all appropriate actions to preserve the confidentiality of all Confidential Information. Access to Confidential Information should be limited to persons who need the Confidential Information to perform their jobs and are subject to your general policy on maintaining confidentiality as a condition of employment or who have first signed a confidentiality agreement. You will not permit copying of Confidential Information (including, as to computer software, any translation, decompiling, decoding, modification or other alteration of the source code of such software). You will use Confidential Information only for the Facility and to perform under this Agreement. Upon termination (or earlier, as we may request), you shall return to us all originals and copies of the System Standards Manual, policy statements and Confidential Information "fixed in any tangible medium of expression," within the meaning of the U.S. Copyright Act, as amended. Your obligations under this subsection commence when you sign this Agreement and continue for trade secrets (including computer software we license to you) as long as they remain secret and for other Confidential Information, for as long as we continue to use the information in confidence, even if edited or revised, plus three years. We will respond promptly and in good faith to your inquiry about continued protection of any Confidential Information.

15.5 **Litigation.** You will promptly notify us of (i) any adverse or infringing uses of the Marks (or names or symbols confusingly similar), Confidential Information or other System intellectual property, and (ii) or any threatened or pending litigation related to the System against (or naming as a party) you or us of which you become aware. We alone handle disputes with third parties concerning use of all or any part of the System. You will cooperate with our efforts to resolve these disputes. We need not initiate suit against imitators or infringers who do not have a material adverse impact on the Facility, or any other suit or proceeding to enforce or protect the System in a matter we do not believe to be material.

15.6 **The Internet.** You may use the Internet to market the Facility subject to this Agreement and System Standards. You shall not use, license or register any domain name, universal resource locator, or other means of identifying you or the Facility that uses a mark or any image or language confusingly similar to a Mark without our consent. You will assign to us any such identification at our request without compensation or consideration. You must make available through the Reservation System and the Chain website all rates you offer to the general public via Internet marketing arrangements with third parties. You must participate in the Chain's best available rate on the Internet guarantee or successor program. The content you provide us or use yourself for any Internet marketing must be true, correct and accurate, and you will notify us in writing promptly when any correction to the content becomes necessary. You shall promptly modify at our request the content of any Internet marketing material for the Facility you use, authorize, display or provide to conform to System Standards. Any use of the Marks and other elements of the System on the Internet inures to our benefit under Section 15.2.

16. **Relationship of Parties.**

16.1 **Independence.** You are an independent contractor. You are not our legal representative or agent, and you have no power to obligate us for any purpose whatsoever. We and you have a business relationship based entirely on and circumscribed by this Agreement. No partnership, joint venture, agency, fiduciary or employment relationship is intended or created by reason of this Agreement. You will exercise full and complete control over and have full responsibility for your contracts, daily operations, labor relations, employment practices and policies, including, but not limited to, the recruitment, selection, hiring, disciplining, firing, compensation, work rules and schedules of your employees.

16.2 **Joint Status.** If you comprise two or more persons or entities (notwithstanding any agreement, arrangement or understanding between or among such persons or entities) the rights, privileges and benefits of this Agreement may only be exercised and enjoyed jointly. The liabilities and responsibilities under this Agreement will be the joint and several obligations of all such persons or entities.

17. **Legal Matters.**

17.1 **Partial Invalidity.** If all or any part of a provision of this Agreement violates the law of your state (if it applies), such provision or part will not be given effect. If all or any part of a provision of this Agreement is declared invalid or unenforceable, for any reason, or is not given effect by reason of the prior sentence, the remainder of the Agreement shall not be affected. However, if in our judgment the invalidity or ineffectiveness of such provision or part substantially impairs the value of this Agreement to us, then we may at any time terminate this Agreement by written notice to you without penalty or compensation owed by either party.

17.2 **Waivers, Modifications and Approvals.** If we allow you to deviate from this Agreement, we may insist on strict compliance at any time after written notice. Our silence or inaction will not be or establish a waiver, consent, course of dealing, implied modification or estoppel. All modifications, waivers, approvals and consents of or under this Agreement by us must be in writing and signed by our authorized representative to be effective. We may unilaterally revise Schedule C when this Agreement so permits.

17.3 **Notices.** Notices will be effective if in writing and delivered (i) by facsimile transmission with confirmation original sent by first class mail, postage prepaid, (ii) by delivery service, with proof of delivery, or (iii) by first class, prepaid certified or registered mail, return receipt requested, to the appropriate party (x) at its address stated below or as it may otherwise designate by notice, or (y) by such other means as to result in actual or constructive receipt by the person or office holder designated below. The parties may also communicate via electronic mail between addresses to be established by notice. You consent to receive electronic mail from us. Notices shall be deemed given on the date delivered or date of attempted delivery, if refused.

Ramada Worldwide Inc.:
Our address: 1 Sylvan Way, P.O. Box 278, Parsippany, New Jersey 07054-0278

Attention: Vice President-Franchise Administration;
Fax No. 1-800-643-2107

Your name: **INN ON THE HILL HATTIESBURG, LLC**
Your address: **6702 Heritage Bus. Ct, Chattanooga, TN 37421**
Attention: **Nich Sheth**
Your fax No.: **423-593-5482**

17.4  **Remedies.**  Remedies specified in this Agreement are cumulative and do not exclude any remedies available at law or in equity.  The non-prevailing party will pay all costs and expenses, including reasonable attorneys' fees, incurred by the prevailing party to enforce this Agreement or collect amounts owed under this Agreement.

17.5  **Miscellaneous.**  This Agreement is exclusively for the benefit of the parties.  There are no third party beneficiaries.  No agreement between us and anyone else is for your benefit.  The section headings in this Agreement are for convenience of reference only.

17.6  **Choice of Law; Venue; Dispute Resolution.**

17.6.1  This Agreement will be governed by and construed under the laws of the State of New Jersey, except for its conflicts of law principles.  The New Jersey Franchise Practices Act will not apply to any Facility located outside the State of New Jersey.

17.6.2  The parties shall attempt in good faith to resolve any dispute concerning this Agreement or the parties' relationship promptly through negotiation between authorized representatives.  If these efforts are not successful, either party may attempt to resolve the dispute through non-binding mediation.  Either party may request mediation through the National Franchise Mediation Program, using the procedures employed by the CPR Institute for Dispute Resolution, Inc.  We will provide you with the contact address for that organization.  The mediation will be conducted by a mutually acceptable and neutral third party.  If the parties cannot resolve the dispute through negotiation or mediation, or choose not to negotiate or mediate, either party may pursue litigation.

17.6.3  You consent and waive your objection to the non-exclusive personal jurisdiction of and venue in the New Jersey state courts situated in Morris County, New Jersey and the United States District Court for the District of New Jersey for all cases and controversies under this Agreement or between we and you.

17.6.4  **WAIVER OF JURY TRIAL.  THE PARTIES WAIVE THE RIGHT TO A JURY TRIAL IN ANY ACTION RELATED TO THIS AGREEMENT OR THE RELATIONSHIP BETWEEN THE LICENSOR, THE LICENSEE, ANY GUARANTOR, AND THEIR RESPECTIVE SUCCESSORS AND ASSIGNS.**

17.7  **Special Acknowledgments.  You acknowledge the following statements to be true and correct as of the date you sign this Agreement, and to be binding on you.**

**17.7.1**  You received our UFOC for prospective licensees at least 10 business days before, and a copy of this Agreement and all other agreements we are asking you to sign at least 5 business days before, signing this Agreement and paying the Initial Fee to us.  You have received our UFOC at least 10 business days before you paid any fee to us or signed any contract with us.

**17.7.2**  Neither we nor any person acting on our behalf has made any oral or written representation or promise to you on which you are relying to enter into this Agreement that is not written in this Agreement.  You release any claim against us or our agents based on any oral or written representation or promise not stated in this Agreement.

**17.7.3**  This Agreement, together with the exhibits and schedules attached, is the entire agreement superseding all previous oral and written representations, agreements and understandings of the parties about the Facility and the License.

**17.7.4**  You acknowledge that no salesperson has made any promise or provided any information to you about projected sales, revenues, income, profits or expenses from the Facility except as stated in Item 19 of the UFOC or in a writing that is attached to this Agreement.

**17.7.5**  You understand that the franchise relationship is an arms' length, commercial business relationship in which each party acts in its own interest.

**17.8  Protected Territory.**  We will not own, operate, lease, manage, or license any party but you to operate a Chain Facility in the "Protected Territory", defined below, while this Agreement is in effect.  We may own, operate, lease, manage, franchise or license anyone to operate any Chain Facility located anywhere outside the Protected Territory without any restriction or obligation to you.  We may grant Protected Territories for other Chain Facilities that overlap your Protected Territory.  While this Agreement is in effect, neither you nor your officers, directors, general partners or owners of 25% or more of your Equity Interests, may own, operate, lease, manage or franchise (i) any guest lodging facility other than the Facility in the Protected Territory unless we or our affiliate licenses the facility, and/or (ii) any time share resort, vacation club, residence club, fractional ownership residence, condominium/apartment leasing or rental business, or the like, for any facility or business that shares directly or indirectly, common areas, amenities, recreation facilities, services, supplies or support activities with the Facility.  You will use any information obtained through the Reservation System to refer guests, directly or indirectly, only to Chain Facilities.  This Section does not apply to any Chain Facility located in the Protected Territory on the Effective Date, which we may renew, relicense, allow to expand, or replace with a replacement Facility located within the same trading area having not more than 120% of the guest rooms of the replaced Chain Facility if its license with us terminates or is not renewed.   The Protected Territory fairly represents the Facility's trading area, and you acknowledge that.  There are no express or implied territorial rights or agreements between the parties except as stated in this Section.  By electing to include this section in your Agreement, you irrevocably waive any right to seek or obtain the benefits of any policy we now follow or may in the future follow to notify you about proposed Chain Facilities in the general area of the Facility, solicit information about the effect of the proposed Chain Facility on the revenue or

RAMEXC1
216571 03/07

occupancy of the Facility or decide whether to add the proposed Chain Facility to the Chain based on the potential effect of the proposed Chain Facility on the Facility or its performance. The covenants in this Section are mutually dependent; if you breach this Section, your Protected Territory will be the Location only. The Protected Territory means **a five (5) mile radius from the front door of the Facility.**

**18. Special Stipulations.** The following special stipulations apply to this Agreement and supersede any inconsistent or conflicting provisions. You acknowledge that these stipulations and any changes made to the body of the Agreement at your request or in response to other changes to our form agreement are the product of arms' length negotiations with us and represent mutually agreed, material inducements to enter into this Agreement, beneficial to you and supported by adequate consideration from both parties. These are personal to you and are not transferable or assignable except to a Permitted Transferee.

18.1 **Special Recurring Fees.** Notwithstanding Section 7.1. the Recurring Fees accruing during the following periods will be payable in place of fees that are computed as a percentage of Gross Room Revenues (excluding commissions and related service charges, Internet fees, the Special Marketing Assessment, service fees and charges, guest reward and affinity program fees, guest complaint assessments, GDS Fees and similar fees and charges described in Schedule C) as follows, **provided that the Facility opens by the deadline specified in Section 3.1 of this Agreement:**

18.1.1 The Recurring Fee of $100,000.00 is payable in equal monthly installments of $8,333.33, during the first License Year up to $2,700,000.00; and eight and one half percent (8.5%) of Gross Room Revenues accruing during the first License Year over $2,700,000.00;

18.1.2 The Recurring Fee of $105,000.00 is payable in equal monthly installments of $8,750.00, during the second License Year up to $2,700,000.00; and eight and one half percent (8.5%) of Gross Room Revenues accruing during the second License Year over $2,700,000.00;

18.1.3 The Recurring Fee of $110,000.00 is payable in equal monthly installments of $9,166.66, during the third License Year up to $2,700,000.00; and eight and one half percent (8.5%) of Gross Room Revenues accruing during the third License Year over $2,700,000.00;

18.1.4 The Recurring Fee of $115,000.00 is payable in equal monthly installments of $9,583.33, during the fourth License Year up to $2,700,000.00; and eight and one half percent (8.5%) of Gross Room Revenues accruing during the fourth License Year over $2,700,000.00;

18.1.5 The Royalty and RINA Services Assessment Fees shall be computed and paid at the rates specified in Section 7.1 on Gross Room Revenues accruing after the fourth License Year.

18.1.6 The rate changes set forth in this Section automatically terminate without notice or opportunity to cure, and the Combined Fee shall reset to the rates specified in Section 7, if and as of the date (i) a Termination occurs, or we send you a notice of default and you fail to cure the default within the time specified, if any, in the notice of default, or (ii) after you satisfy the Improvement Obligation, the Facility receives a quality assurance inspection score of more than 125 (or its then

equivalent) and the Facility fails to achieve a quality assurance inspection score of less than 125 in a reinspection to be performed not less than 60 days after the initial inspection.

18.2   **Your Additional Termination Right.** You may terminate the License without cause or penalty effective only on the eighth or tenth anniversaries of the Opening Date provided you give us at least six (6) months prior written notice of termination and you are not in default under this Agreement at the time notice must be given or at the effective date of termination. You will pay no Liquidated Damages if you satisfy the conditions of the preceding sentence and you perform the post termination obligations specified in this Agreement within 10 days after the effective date of termination. Your rights under this Section will automatically terminate without notice if and as of the date (i) a Termination occurs, (ii) you fail to cure any default under this Agreement within the time permitted, if any, in the notice of default we send you, or (iii) after the Facility satisfies the Improvement Obligation, the Facility scores more than 200 points (or its then equivalent) on a quality assurance inspection and then fails to achieve a score less than 200 points (or its then equivalent) in a reinspection to be performed no sooner than 90 days after the initial inspection. You will not exercise this right if the Facility is then financed under a program in which the United States Small Business Administration ("SBA") guarantees the financing or its repayment unless you first obtain SBA's consent.

18.3   **Our Additional Termination Right.** We may terminate the License without cause or penalty effective only on the eighth or tenth anniversaries of the Opening Date provided we give you at least six (6) months prior written notice of termination. You will perform the post termination obligations specified in this Agreement within 10 days after the effective date of termination. You will pay no Liquidated Damages if we terminate the License under this Section and you perform the post termination obligations specified in this Agreement within 10 days after the effective date of termination. We will not exercise this right if you notify us that the Facility is then financed under a program in which the United States Small Business Administration ("SBA") guarantees the financing or its repayment unless we first obtain SBA's consent.

18.4   **Liquidated Damages.** Liquidated Damages payable under Section 12.1 for a Termination that occurs before the last two License Years will be One Thousand Dollars ($1,000.00) for each guest room of the Facility you are authorized to operate at the time of Termination.

18.5   **Reduced Relicense Fee.** If (i) you are not then in default under this Agreement, and (ii) we receive your proposed transferee's Franchise Application and Application Fee before you Transfer the Facility, then the Relicense Fee for a Transfer will be $5,000.00 if we receive the proposed transferee's Franchise Application before the end of the fifth License Year and $10,000.00 if we receive the proposed transferee's Franchise Application after the fifth License Year and before the end of the tenth License Year. If the conditions are not satisfied, and after the tenth License Year, the Relicense Fee will be as specified in Section 7.4.

IN WITNESS WHEREOF, the parties have executed this Agreement on this 31st day of March, 2008 and agree to be bound by the terms and conditions of this Agreement as of the Effective Date.

WE:
RAMADA WORLDWIDE INC.:

By: _____
      Vice President


YOU, as licensee:
INN ON THE HILL HATTIESBURG, LLC

By: _____
      Manager

RAMEXC1
216571 03/07

## APPENDIX A

### DEFINITIONS

Agreement means this License Agreement.

Application Fee means the fee you pay when you submit your Application under Section 6.

Approved Plans means your plans and specifications for constructing or improving the Facility initially or after opening, as approved by us under Section 3.

Casualty means destruction or significant damage to the Facility by act of God or other event beyond your reasonable anticipation and control.

Chain means the network of Chain Facilities.

Chain Facility means a lodging facility we own, lease, manage, operate or authorize another party to operate using the System and identified by the Marks.

Condemnation means the taking of the Facility for public use by a government or public agency legally authorized to do so, permanently or temporarily, or the taking of such a substantial portion of the Facility that continued operation in accordance with the System Standards, or with adequate parking facilities, is commercially impractical, or if the Facility or a substantial portion is sold to the condemning authority in lieu of condemnation.

Conference Registration Fee means the fee charged for attendance at the annual RINA conference.

Confidential Information means any trade secrets we own or protect and other proprietary information not generally known to the lodging industry including confidential portions of the System Standards Manual or information we otherwise impart to you and your representatives in confidence. Confidential Information includes the "Standards of Operation and Design Manual" and all other System Standards manuals and documentation, including those on the subjects of employee relations, finance and administration, field operation, purchasing and marketing, the Reservation System software and applications software.

Design Standards mean standards specified in the System Standards Manual from time to time for design, construction, renovation, modification and improvement of new or existing Chain Facilities, including all aspects of facility design, number of rooms, rooms mix and configuration, construction materials, workmanship, finishes, electrical, mechanical, structural, plumbing, HVAC, utilities, access, life safety, parking, systems, landscaping, amenities, interior design and decor and the like for a Chain Facility.

Directory means the general purpose directory we publish listing the names and addresses of Chain Facilities, and at our discretion, other Ramada facilities located outside the United States, Canada and Mexico.

26

<u>Effective Date</u> means the date we insert in the Preamble of this Agreement after we sign it.

<u>Equity Interests</u> shall include, without limitation, all forms of equity ownership of you, including voting stock interests, partnership interests, limited liability company membership or ownership interests, joint and tenancy interests, the proprietorship interest, trust beneficiary interests and all options, warrants, and instruments convertible into such other equity interests.

<u>Equity Transfer</u> means any transaction in which your owners or you sell, assign, transfer, convey, pledge, or suffer or permit the transfer or assignment of, any percentage of your Equity Interests that will result in a change in control of you to persons other than those disclosed on Schedule B, as in effect prior to the transaction. Unless there are contractual modifications to your owners' rights, an Equity Transfer of a corporation or limited liability company occurs when either majority voting rights or beneficial ownership of more than 50% of the Equity Interests changes. An Equity Transfer of a partnership occurs when a newly admitted partner will be the managing, sole or controlling general partner, directly or indirectly through a change in control of the Equity Interests of an entity general partner. An Equity Transfer of a trust occurs when either a new trustee with sole investment power is substituted for an existing trustee, or a majority of the beneficiaries convey their beneficial interests to persons other than the beneficiaries existing on the Effective Date. An Equity Transfer does not occur when the Equity Interest ownership among the owners of Equity Interests on the Effective Date changes without the admission of new Equity Interest owners. An Equity Transfer occurs when you merge, consolidate or issue additional Equity Interests in a transaction which would have the effect of diluting the voting rights or beneficial ownership of your owners' combined Equity Interests in the surviving entity to less than a majority.

<u>Facility</u> means the Location, together with all improvements, buildings, common areas, structures, appurtenances, facilities, entry/exit rights, parking, amenities, FF&E and related rights, privileges and properties existing at the Location on the Effective Date or afterwards.

<u>FF&E</u> means furniture, fixtures and equipment.

<u>FF&E Standards</u> means standards specified in the System Standards Manual for FF&E and supplies to be utilized in a Chain Facility.

<u>Food and Beverage</u> means any restaurant, catering, bar/lounge, entertainment, room service, retail food or beverage operation, continental breakfast, food or beverage concessions and similar services offered at the Facility.

<u>Gross Room Revenues</u> means gross revenues attributable to or payable for rentals of guest rooms at the Facility, including all credit transactions, whether or not collected, but excluding separate charges to guests for Food and Beverage, room service, telephone charges, key forfeitures and entertainment; vending machine receipts; and federal, state and local sales, occupancy and use taxes.

RAMEXC1
216571 03/07

Improvement Obligation means your obligation to either (i) renovate and upgrade the Facility, or (ii) construct and complete the Facility, in accordance with the Approved Plans and System Standards, as described in Section 3.

Indemnitees means us, our direct and indirect parent, subsidiary and sister corporations, and the respective officers, directors, shareholders, employees, agents and contractors, and the successors, assigns, personal representatives, heirs and legatees of all such persons or entities.

Initial Fee means the fee you are to pay for signing this Agreement as stated in Section 6.

License means the non-exclusive license to operate the type of Chain Facility described in Schedule B only at the Location, using the System and the Mark we designate in Section 1.

License Year means:

(i) If the Opening Date occurs on the first day of a month: the period beginning on the Opening Date and ending on the day immediately preceding the first anniversary of the Opening Date, and each subsequent one year period; or

(ii) If the Opening Date does not occur on the first day of a month: the period beginning on the Opening Date and ending on the first anniversary of the last day of the month in which the Opening Date occurs, and each subsequent one year period.

Liquidated Damages means the amounts payable under Section 12, set by the parties because actual damages will be difficult or impossible to ascertain on the Effective Date and the amount is a reasonable pre-estimate of the damages that will be incurred and is not a penalty.

Location means the parcel of land situated at **6595 US Highway 49, Hattiesburg, MS 39401**, as more fully described in Schedule A.

Losses and Expenses means (x) all payments or obligations to make payments either (i) to or for third party claimants by any and all Indemnitees, including guest refunds, or (ii) incurred by any and all Indemnitees to investigate, respond to or defend a matter, including without limitation investigation and trial charges, costs and expenses, attorneys' fees, experts' fees, court costs, settlement amounts, judgments and costs of collection; and (y) the "Returned Check Fee" we then specify in the System Standards Manual ($20.00 on the Effective Date) if the drawee dishonors any check that you submit to us.

Maintenance Standards means the standards specified from time to time in the System Standards Manual for repair, refurbishment and replacement of FF&E, finishes, decor, and other capital items and design materials in Chain Facilities.

Marks means, collectively (i) the service marks associated with the System published in the System Standards Manual from time to time including, but not limited to, the name, design and logo for "Ramada" and other marks (U.S. Reg. Nos. 849,591 and 1,191,422) and (ii)

RAMEXC1
216571 03/07

trademarks, trade names, trade dress, logos and derivations, and associated good will and related intellectual property interests.

<u>Marks Standards</u> means standards specified in the System Standards Manual for interior and exterior Mark-bearing signage, advertising materials, china, linens, utensils, glassware, uniforms, stationery, supplies, and other items, and the use of such items at the Facility or elsewhere.

<u>Minor Renovation</u> means the repairs, refurbishing, repainting, and other redecorating of the interior, exterior, guest rooms, public areas and grounds of the Facility and replacements of FF&E we may require you to perform under Section 3.16.

<u>Minor Renovation Ceiling Amount</u> means $3,000.00 per guest room.

<u>Minor Renovation Notice</u> means the written notice from us to you specifying the Minor Renovation to be performed and the dates for commencement and completion given under Section 3.16.

<u>Opening Date</u> means the date on which we authorize you to open the Facility for business identified by the Marks and using the System.

<u>Operations Standards</u> means standards specified in the System Standards Manual for cleanliness, housekeeping, general maintenance, repairs, concession types, food and beverage service, vending machines, uniforms, staffing, employee training, guest services, guest comfort and other aspects of lodging operations.

<u>Permitted Transferee</u> means (i) any entity, natural person(s) or trust receiving from the personal representative of an owner any or all of the owner's Equity Interests upon the death of the owner, if no consideration is paid by the transferee or (ii) the spouse or adult issue of the transferor, if the Equity Interest transfer is accomplished without consideration or payment, or (iii) any natural person or trust receiving an Equity Interest if the transfer is from a guardian or conservator appointed for an incapacitated or incompetent transferor.

<u>Punch List</u> means the list of upgrades and improvements attached as part of Schedule B, which you are required to complete under Section 3.

<u>Recurring Fees</u> means fees paid to us on a periodic basis, including without limitation, Royalties, RINA Services Assessment Fees, and other reservation fees and charges as stated in Section 7.

<u>Reinspection Fee</u> means the fee you must pay to us under Section 3.9 if you do not complete your Punch List on time, fail any inspection or do not cooperate with our inspector or inspection System Standards.

<u>Relicense Fee</u> means the fee your transferee or you pay to us under Section 7 when a Transfer occurs.

Reservation System or "Central Reservation System" means the system for offering to interested parties, booking and communicating guest room reservations for Chain Facilities described in Section 4.2.

RINA means the Ramada Inns National Association.

RINA Services Assessment Fees means the assessments charged as set forth in Section 7.1.2.

Rooms Addition Fee means the fee we charge you for adding guest rooms to the Facility.

Royalty means the monthly fee you pay to us for use of the System under Section 7.1.1. "Royalties" means the aggregate of all amounts owed as a Royalty.

Service Interruption Fee means the fee you pay us when we suspend Central Reservation Service because you default under this Agreement, in the amount specified in Schedule C.

System means the comprehensive system for providing guest lodging facility services under the Marks as we specify which at present includes only the following: (a) the Marks; (b) other intellectual property, including Confidential Information, System Standards Manual and know-how; (c) marketing, advertising, publicity and other promotional materials and programs; (d) System Standards; (e) training programs and materials; (f) quality assurance inspection and scoring programs; and (g) the Reservation System.

System Standards means the standards for participating in the System published in the System Standards Manual, including but not limited to Design Standards, FF&E Standards, Marks Standards, Operations Standards, Technology Standards and Maintenance Standards and any other standards, policies, rules and procedures we promulgate about System operation and usage.

System Standards Manual means the Standards of Operation and Design Manual and any other manual we publish or distribute specifying the System Standards.

Taxes means the amounts payable under Section 7.2 of this Agreement.

Technology Standards means standards specified in the System Standards Manual for local and long distance telephone communications services, telephone, telecopy and other communications systems, point of sale terminals and computer hardware and software for various applications, including, but not limited to, front desk, rooms management, records maintenance, marketing data, accounting, budgeting and interfaces with the Reservation System to be maintained at the Chain Facilities.

Term means the period of time during which this Agreement shall be in effect, as stated in Section 5.

Termination means a termination of the License under Sections 11.1 or 11.2 or your termination of the License or this Agreement.

RAMEXC1
216571 03/07

Transfer means (1) an Equity Transfer, (2) you assign, pledge, transfer, delegate or grant a security interest in all or any of your rights, benefits and obligations under this Agreement, as security or otherwise without our consent as specified in Section 9, (3) you assign (other than as collateral security for financing the Facility) your leasehold interest in (if any), lease or sublease all or any part of the Facility to any third party, (4) you engage in the sale, conveyance, transfer, or donation of your right, title and interest in and to the Facility, (5) your lender or secured party forecloses on or takes possession of your interest in the Facility, directly or indirectly, or (6) a receiver or trustee is appointed for the Facility or your assets, including the Facility. A Transfer does not occur when you pledge or encumber the Facility to finance its acquisition or improvement, you refinance it, or you engage in a Permitted Transferee transaction.

"You" and "Your" means and refers to the party named as licensee identified in the first paragraph of this Agreement and its Permitted Transferees.

"We", "Our" and "Us" means and refers to Ramada Worldwide Inc., a Delaware corporation, its successors and assigns.

RAMEXCI
216571 03/07

# SCHEDULE A

**(Legal Description of Facility)**

RAMEXC1
216571 03/07

Sent By: Wyndham Hotel Group;          404 240 0962;          Mar-27-08  2:40PM;          Page 5

EXHIBIT "A"                                                         8954739

....ATTACHED TO AND FORMING PART OF DEED OF TRUST IN THE NAME OF INN ON THE HILL
HATTIESBURG, LLC  IN THE AMOUNT OF $2,350,000.00 DATED 10/19/07.

A parcel of land located in the North ½ of the Southwest ¼, Section 31, Township 5 North, Range 13
West, Forrest County, Mississippi and more particularly described as follows: Commence at the Southwest
corner of the Northeast ¼ of the Southwest ¼, Section 31, Township 5 North, Range 13 West, Forrest
County, Mississippi. Thence North zero (00) degrees, eighteen (18) minutes, forty-eight (48) seconds
West, along the West line of the said Northeast ¼ of the Southwest ¼ 189.9 feet to the North right of
way line of Campbell Scenic Drive and the point of beginning, also known as the point of curvature of a
curve to the right having a central angle of thirty-one (31) degrees, forty-one (41) minutes, fifteen (15)
seconds, a radius of 157.14 feet, a chord distance of 91.26 feet, and a chord bearing of North forty-eight
(48) degrees, forty-four (44) minutes, twenty-six (26) seconds West; thence Northwesterly along said
curve to the right, and said Northern right of way line of Campbell Scenic Drive 92.44 feet; thence North
five (05) degrees, fifty-two (52) minutes, thirty (30) seconds East and along the Eastern right of way line
of said Campbell Scenic Drive 216.08 feet; thence East 45.56 feet to the said West line of the Northeast
¼ of the Southwest ¼; thence North and along the said West line of the Northeast ¼ of the Southwest
¼ 20.0 feet; thence West 43.75 feet to the said Eastern right of way line of Campbell Scenic Drive;
thence North five (05) degrees, fifty-two (52) minutes, thirty (30) seconds East and along the said
Eastern right of way line of Campbell Scenic Drive 121.64 feet; thence East 31.3 feet to a point on the
said West line of the Northeast ¼ of the Southwest ¼; thence North forty-six (46) degrees, thirty-nine
(39) minutes, zero (00) seconds East 349.0 feet; thence South forty-three (43) degrees, twenty-one (21)
minutes, zero (00) seconds East, 129.0 feet; thence North forty-six (46) degrees, thirty-nine (39)
minutes, zero (00) seconds East 160.00 feet to the West right of way line of U.S. Highway # 49; thence
South forty-three (43) degrees, twenty-one (21) minutes, zero (00) seconds East, and along the said
West right of way line of U.S. Highway # 49 436.0 feet; thence South sixty-eight (68) degrees, forty-
eight (48) minutes, forty-six (46) seconds West 811.51 feet to a point on the said West line of the
Northeast ¼ of Southwest ¼; thence South zero (00) degrees, eighteen (18) minutes, forty-eight (48)
seconds East and along the said West line of the Northeast ¼ of the Southwest ¼ 60.7 feet to the Point
of Beginning; said parcel of land is located in the North ½ of the Southwest ¼, Section 31, Township 5
North, Range 13 West, Forrest County, Mississippi and contains 6.35 acres (276,684 Sq. Ft.) more or less.


Utility Easement Description:

A ten (10) foot strip located in the NE¼ of the SW¼ Section 31, Township 5 North, Range 13 West,
Forrest County, Mississippi and more particularly described as follows: Commence at the SW corner of
the NE¼ of SW¼, Section 31, Township 5 North, Range 13 West, Forrest County, Mississippi; thence
North and along the West line of the East ½ of the SW¼ 178.0 feet to the Point of Beginning; thence
continue North along said line 72.6 feet; thence North 68 degrees, 50 minutes, 45 seconds East 10.8
feet; thence South 77.0 feet; thence West 10.0 feet to the Point of Beginning; said easement contains
0.017 acres more or less.


SIGNED FOR IDENTIFICATION PURPOSES ONLY:
INN ON THE HILL HATTIESBURG, LLC

_____  10/19/07        _____  10/19/07

MEETA SHETH, MEMBER                        GHANSHYAM PATEL, MEMBER

03/26/2008  20:05    716-634-0772              SAM PATEL                          PAGE  02

LOAN DEPOT

03/23/2006  09:21     4238928048

# SCHEDULE B

**PART I:**      YOUR OWNERS:

|  | Type of | (Title) |
|---|---|---|
|  | Equity Interest | Office Held |

Name      Ownership
          Percentage

Meeta Sheth       50%           ~~Manager~~ member
~~Gautam Patel~~  50%           Member

Ghonshyam Patel


**PART II:**      THE FACILITY:

Primary designation of Facility: **Ramada Inn**

Number of approved guest rooms: 119

Parking facilities (number of spaces, description): **119**

Other amenities, services and facilities: Restaurant, **Outdoor Pool, Lounge and Exercise Room**


**PART III:**    DESCRIPTION AND SCHEDULE OF RENOVATIONS TO BE
                COMPLETED AS THE IMPROVEMENT OBLIGATION:


[**Punch List to be attached.**]


_____
Initial

RAMRXCH
216571 03/07

34

Sent By: Wyndham Hotel Group;          404 240 0962;          Mar-31-08   7:12PM;          Page 2

03/28/2008  08:28   4238920807                  LOAN DEPOT                                    PAGE 02/14

MS HATTIESBURG INN ON THE HILL CV RA

Tier: Ten

**RAMADA**
WORLDWIDE

Ramada Worldwide, Inc.
Franchise & Conversion
Schedule B Part III
November 1, 2007
Revised on March 31, 2008

Sent by: Wyndham Hotel Group;          404 240 0982;          Mar-31-08  7:12PM;          Page 3/16

03/29/2006  08:28    42389208                LOAN DEPOT                        PAGE  03/14

MS HATTIESBURG ON THE HILL CV RA

The existing "chalk board" accent wall in lounge is acceptable if condition is maintained.

Existing 25" television units are acceptable until condition grades is "Moderate" on any future Quality Assurance Evaluation. Upon replacement, a minimum 27" units per System Standards are required.

The trash period has been waived by the Brand.

The Brand has approved the altered use of the existing street signage (to retain grandfathered sign placement) to consist of the following at minimum: (a) all the signs must be designated for the Ramada Logo and "R" and (b) further two or the Hill and Brand Approval. The two signs will be separated by a solid band that is developed, the expectation box on the Hill and Brand has approved the portable placement of channel letters and "R" symbol on the building but on the Hill building signage.

For Office Use Only

Page 2   of 15

Quality Assurance

Rooms

Sent By: Wyndham Hotel Group,                    404 240 0982;          Mar-31-08  7:13PM;          Page 4/16

03/28/2005  08:28   42389208                  LOAN DEPOT                              PAGE  04/14

**MS HATTIESBURG INN ON THE HILL CV/RA**

Page 3 of 16

EXTERIOR

| DATE COMPLETION | SCOPE OF WORK | For Office Use Only |
|---|---|---|
| Prior to opening | Signage must be purchased or leased and must be manufactured by Persons Inc. Signage may not be installed without prior written approval. Your License Agreement controls your use of signage and timing of installation. All existing signage (building, high-rise, channel letters, billboards, etc.) be removed. | |
| 120 days after opening | Exterior renovation plans must be approved prior to commencement of work through written approval by Design Services at (877) WHG-1515. At a minimum, plans should include routine modification and Company design features. | |
| 120 days after opening | The enhancement of the roofline around the perimeter of the building is required to improve the property's curb appeal. Apply a cornice to the fascia of the building along the roofline of the commercial and guestroom buildings. | |
| 120 days after opening | Redesign guestroom and porte cochere pediment to incorporate Ramada design feature. | |
| 120 days after opening | Repair/recoat stucco facade on commercial and guestroom buildings per manufacturer's specifications. Contact Design Services for recommended color schemes. One consistent exterior finish system is required. | |
| 120 days after opening | Prep, prime and paint commercial and guestroom building exterior (guestroom doors, service doors, trim, fascia, railings and stairwells). Contact Design Services for recommended color schemes. One consistent color scheme to be installed in entire system (i.e. vent, aluminum or thru-out commercial finish) around guestroom building. | |
| 120 days after opening | Replace "baby light" windows on commercial building to eliminate broken seals and fogged appearance. | |
| 120 days after opening | Replace all porte-cochere, walkway, stairwell and building lights with upgraded fixtures that complement building exterior. One consistent style is required. | |
| 120 days after opening | Replace PTAC louvers. Ensure new louvers are uniform in style. | |
| 120 days after opening | Replace walkway turf with a surface designed for commercial traffic at lobby entrance. | |
| 120 days after opening | Repair/refinish walkways, stairways, stairwell steps and landings around commercial and guestroom buildings. Repair damaged walkways prior to painting. Non-slip textured finish is required. | |
| Prior to opening | Replace guestroom entrance door thresholds. | |
| Prior to opening | Replace emergency exit lighting/signage where damaged. | |
| Prior to opening | Replace fire extinguisher casings where rusted or damaged. Ensure new casings are equipped with breaker bars and glass fronts. | |

Quality Assurance

Initials [illegible] / [illegible]

Sent By: Wyndham (Hotel Group);                    404 240 0982;        Mar-31-08  7:13PM;        Page 5/16
03/29/2005   08:28    42389208              LOAN DEPOT                            PAGE  05/14

## MS HATTIESBURG INN ON THE HILL CV /SA

| COMPLETION DATE | SCOPE OF WORK EXTERIOR | For Office Use Only |
|---|---|---|
| 120 days after opening | Replace trashcans around commercial and guestroom buildings. | |
| 120 days after opening | Provide a professionally produced and displayed directional signage package. | |
| 120 days after opening | Replace stairwell railings per International Building Code, state and local codes and laws, as well as satisfying all criteria listed in the Standards of Operations Manual. Ensure walkway and stairwell railings are uniform in style. | |
| 120 days after opening | Hot patch, reseal and stripe parking lot. Resurface badly cracked and damaged areas. | |
| 120 days after opening | Resurface drive-thru concrete pad under porte-cochere. | |
| 120 days after opening | Paint parking lot light poles/bases. | |
| June 1, 2006 | Install additional landscaping beds to include trees, shrubs, colorful flowers and groundcover concentrating around property entrance (per sample FP-5) and porte-cochere (per sample FP-7). Provide additional ground cover (mulch, rock, bark) in existing landscaped areas. | |
| June 1, 2006 | Reseed grass areas where barren in courtyard and swimming pool areas. | |
| Prior to opening | Replace self-closing/latching mechanism for the swimming pool gates. | |
| June 1, 2006 | Prep, prime and paint swimming pool fence. | |
| June 1, 2006 | Refinish swimming pool deck to a like-new condition. | |
| June 1, 2006 | Replace furniture package. A minimum of 4 umbrella tables, 16 chaise lounges and 10 chaise lounges are required. | |
| June 1, 2006 | Replace vertical coping tiles around swimming pool. | |
| June 1, 2006 | Paint swimming pool surface. | |

Printed by WTSHare.com,
Quality Assurance

Initials [signature] Partner

EESBURG INN ON THE HILL CV PA

EXTERIOR

SCOPE OF WORK

Reclean/install "FT and Depth markings on both horizontal and vertical coping of the swimming pool.

Replace inoperable emergency phone at swimming pool.

Replace swimming pool safety equipment and signage package to meet System Standards and display year round.

Replace swimming pool trashcans.

Maintain swimming pool clear water appearance in the off-season with routine maintenance and the proper use of chemicals. Installing a pool cover is an acceptable option.

For Office Use Only

Page 5  of 15

Quality Assurances

**MS HATTIESBURG INN ON THE HILL CV RA**

| COMPLETION DATE | SCOPE OF WORK | For Office Use Only |
|---|---|---|
| Prior to opening | Facilities to assist the handicapped in accordance with local, state and federal codes, regulations and ordinances are required. | |
| Prior to opening | Provide a property management system per System Standards. | |
| 90 days after opening | All owners/general managers are required to attend all Brand orientation/training. | |
| 90 days after opening | Property manager is required to be TripRewards certified and properly must comply with all TripRewards requirements. | |
| Prior to opening | Provide a voicemail system, safe deposit boxes, complimentary USA Today newspapers, logo'd keycards with the 800 reservations number and web address and valet laundry service. | |
| Prior to opening | Provide Complimentary wireless, high-speed internet access in all public spaces form an approved Vendor (i.e. Deep Blue and Ethostream). | |
| Prior to opening | Provide flammable storage per System Standards. | |
| Prior to opening | Replace existing ceiling tiles in lobby. Ensure all replacements match existing tiles in style, color and texture. If replacements do not match total replacement will be required. | |
| Prior to opening | Install wall covering in lobby to include vestibule and behind front desk. Company requires 20 ounce vinyl wall covering. Flat painted walls are not acceptable. | |
| Prior to opening | Replace damaged floor tiles in lobby vestibule. If matching tiles cannot be obtained total replacement will be required. | |
| Prior to opening | Professionally clean lobby carpet. If carpet grades a "Moderate" on the opening evaluation, immediate replacement is required. Company requires minimum 32 ounce cut pile carpet with padding. Carpet must be designed for commercial traffic. | |
| Prior to opening | Replace "Inn on the Hill" floor mats in lobby and vestibule with an approved Ramada Inn logo'd or generic type mats. | |
| Prior to opening | Replace lobby registration desk. | |
| Prior to opening | Replace existing lobby seating package to include tables. Fabric upholstered furniture is required. | |

Quality Assurance

Initials:

NOT PROCESSING item ON THE HILL BY FA

| COMPLETION DATE | PUBLIC AREAS subset or scope | For Office Use Only |
|---|---|---|
| Prior to opening | | |
| Prior to opening | | |

Case 2:13-cv-01073-SRC-CLW   Document 1   Filed 02/22/13   Page 50 of 92 PageID: 50

MS HATTIESBURG INN ON THE HILL CV RA

| COMPLETION DATE | SCOPE OF WORK | For Office Use Only |
|---|---|---|
| 120 days after opening | All exercise equipment must be maintained and inspected as per the manufacturer guidelines and emergency instructions, assumed liability signage and guest use only signage must be permanently displayed in the exercise room. | |
| 120 days after opening | Replace inoperable ceiling light fixtures in guest laundry. | |
| 120 days after opening | Provide light cover for ceiling light fixture in guest laundry. Take covers are not acceptable. | |
| 120 days after opening | Replace flooring in guest laundry. Company requires ceramic or quarry tile. | |
| 120 days after opening | Replace equipment in guest laundry. | |
| 120 days after opening | Refinish/paint exterior doors and trim in commercial laundry. | |
| 120 days after opening | Replace treatment in guest laundry. | |
| 120 days after opening | Provide light covers in commercial laundry. | |
| 120 days after opening | Prep, prime and paint walls in commercial laundry. | |
| 120 days after opening | Replace VCT flooring in commercial laundry. | |

Quality Assurance

Initial

Page 8 of 15

03/28/2006   08:28   42389208          404 240 0962;     Mar-31-08  7:15PM;   PAGE 08/14
                                       LOAN DEPOT                             Page 10/16

MS HATTIESBURG INN ON THE HILL CVRA

Page: 9   of: 15

PROPERTY IMPROVEMENT PLAN (PIP)

| COMPLETION DATE | SCOPE OF WORK | For Office Use Only |
|---|---|---|
| Prior to opening | Facilities to assist the handicapped in accordance with local, state and federal codes, regulations and ordinances are required. | |
| Prior to opening | Ensure the food and beverage facilities are in compliance with all state, city and local codes. | |
| Prior to opening | At the time of inspection the restaurant was open for breakfast (Monday thru Friday 6AM to 10AM), closed for lunch and open for dinner (Monday thru Friday 5PM-9PM and closed Saturday thru Sunday). The lounge was closed at the time of inspection pending liquor license. This is not acceptable. | |
| Prior to opening | The property is required to open the restaurant for breakfast and dinner seven days a week. Room service is recommended. Lunch service has been waived by the Brand. | |
| 120 days after opening | If the lounge does not re-open the combination of a Ramada Convenience Mart per current System Standards is required. In addition, the lounge must be revitalized from guest scopes or renovated for an alternative use (I.e. meeting space or fitness area). Plans are not able to be submitted to Design Services for approval prior to commencement of work. | |
| 120 days after opening | If the restaurant closes a Hospitality Area per current System Standards will be required. Plans are required to be submitted to Design Services for approval prior to commencement of work. If the restaurant closes and the property does not already have a Ramada Mart construction of a Ramada Mart to comply with 3 meal periods per System Standards will be required. | |
| 120 days after opening | Replace hostess stand in restaurant. | |
| 120 days after opening | Replace ceiling tiles and light covers where stained, mismatched or damaged in restaurant, lounge, restaurant kitchen, pre-function hallways, Grand Ballroom and Boardrooms. Ensure all replacements match existing tiles in style, color and texture. If replacements do not match total replacement will be required. Recommend the installation of a new window dressing, draperies with sheers, blinds with a fabric upholstered cornice, valance, etc. to enhance restaurant décor. | |
| 120 days after opening | Replace/install wall covering in restaurant, lounge, pre-function hallways, Grand Ballroom and Boardrooms. Company requires 20-ounce vinyl wall covering. Refinish/stain baseboards. Painted well vinyl and flat painted walls are not acceptable. One coordinated wall finish is required. | |
| 120 days after opening | Replace/repair buckled hardwood floor in restaurant. | |
| 120 days after opening | Replace floor mats in restaurant. | |
| 120 days after opening | Replace tables and chairs in restaurant, fabric upholstered chairs are required. | |

Quality Assurance

Initial AW

Sent by: Wyndham Hotel Group;          404 240 0982;        Mar-31-08  7:15PM;     Page 11/16
03/28/2005   06:28    42389288              LOAN DEPOT            PAGE  09/14

**MS HATTIESBURG INN ON THE HILL CY RA**

Page 10 of 15

| COMPLETION DATE | SCOPE OF WORK | For Office Use Only |
|---|---|---|
| 120 days after opening | Replace buffet service counter in restaurant. | |
| 120 days after opening | Replace banquet tables in restaurant being utilized for breakfast/coffee storage with upgraded breakfast cabinets/countertops. Ensure new cabinetry/countertops coordinate with existing restaurant decor. | |
| 120 days after opening | Replace trash/cans in restaurant. | |
| 120 days after opening | Prep, prime and paint restaurant kitchen doors, trim and ceiling. | |
| 120 days after opening | Provide inoperable ceiling fans in restaurant kitchen. | |
| 120 days after opening | Replace light covers where missing in restaurant kitchen. | |
| 120 days after opening | Replace/install wall tile in restaurant/kitchen where damaged, mismatched or missing. If matching tile cannot be found, entire wall tile must be replaced. Removal of wall tile, installation of dry wall and an approved wall finish is an acceptable option. | |
| 120 days after opening | Replace carpet in lounge, Grand Ballroom and Boardroom meeting rooms. Company requires minimum 32 ounce cut pile carpet with padding. Carpet must be designed for commercial traffic. | |
| 120 days after opening | Replace tables, chairs and bar stools in lounge. Fabric upholstered chairs and bar stools are required. Ensure bar stools are equipped with backs. | |
| 120 days after opening | Replace/refinish bar in lounge. | |
| 120 days after opening | Professionally clean carpet in pre-function hallway. If carpet grades a "Moderate" on the opening evaluation, immediate replacement is required. Company requires minimum 32 ounce cut pile carpet with padding. Carpet must be designed for commercial traffic. | |
| 120 days after opening | Replace floor mats in pre-function hallway with an approved Ramada Inn logo'd or generic type mat. | |
| 120 days after opening | Replace tables and chairs in pre-function hallway. Fabric upholstered chairs are required. | |
| 120 days after opening | Refinish/stain entrance doors in Grand Ballroom and Boardrooms. Replace hardware (i.e. handles/trim). Replace damaged thresholds in Boardrooms. | |

03/28/2006  08:28   42389208~9        404 240 0982;        Mar-31-08  7:15PM;        Page 12/16
LOAN DEPOT                                                    PAGE  10/14

**MS HATTIESBURG INN ON THE HILL CV RA**

| COMPLETION DATE | SCOPE OF WORK | FOOD AND BEVERAGE | For Office Use Only |
|---|---|---|---|
| 120 days after opening | Refinish/paint ceiling in Grand Ballroom. One consistent finish is required. | | |
| 120 days after opening | Replace/provide new window dressing in Grand Ballroom and Boardrooms. Blackout decorative draperies are required. | | |
| 120 days after opening | Replace existing meeting room dividers in Grand Ballroom. Room dividers must be soundproof to 50STC decibel requirements. Accordion type dividers are not acceptable. | | |
| 120 days after opening | Replace banquet style chairs in Grand Ballroom and Boardrooms. Fabric upholstered chairs are required. | | |
| 120 days after opening | Replace damaged tables in Grand Ballroom. | | |
| 120 days after opening | Replace damaged emergency exit lighting in Grand Ballroom. | | |

Quality Assurance

Initials _____

Page  11  of  15

Sent By: Wyndham Hotel Group;                  404 240 0962;        Mar-31-08  7:16PM;        Page 13/16
03/28/2005   09:20   42369208                    LOAN DEPOT                              PAGE  11/14

**MS HATTIESBURG INN ON THE HILL, PA**

**GUESTROOMS**

Page 12 of 15

ROOMS INSPECTED: 102, 112, 133, 140, 159, 157, 129, 211, 240, 242, 226

| DATE COMPLETION | SCOPE OF WORK | For Office Use Only |
|---|---|---|
| Prior to opening | Facilities to assist the handicapped in accordance with local, state and federal codes, regulations and ordinances are required. | |
| Prior to opening | Provide nightlights, full-length mirror, removable wooden hook style hangers, UL trashcans, AM/FM alarm clock radios, coffee makers, data port telephone, irons and full size boards, hairdryers and all required supplies. 80% of rooms must be designated as non-smoking. These make/ networking (HBC, NBC, CBS, FOX, PBS) are required. | |
| Prior to opening | Provide Complimentary wireless, high-speed internet access in all guestrooms from an approved Vendor (i.e. Deep Blue and Ethertones). | |
| Prior to opening | Replace worn or mismatched electronic lock casings on entrance doors. Ensure lock casings are uniform in style. | |
| Prior to opening | Install secondary 14-bar lock on entrance doors where missing as in room #240. Chain locks are not acceptable. | |
| Prior to opening | All guestroom entrance doors must be equipped with a self-closing device. | |
| Prior to opening | Replace contrasting door locks where tarnished as in room #112. A non-view, doorknob latch set and keyway non-keyed, if deadbolt lock or set connecting room door. Operating knobs need be located an room side only with thumb pieces on inside of door. | |
| Prior to opening | Replace smoke detectors per System Standards as in rooms #157, #219 and #240. Hardwired smoke detectors with a backup system is required. This system may be a battery within the unit or a generator system that is capable of restoring electrical service in case of an outage. | |
| Prior to opening | Replace logo/id guestroom number plaques. | |
| 120 days after opening | Replace wallcovering to include border. Company requires either vinyl wallcovering (minimum of 16 ounce) or an approved textured finish. Removal of wall border is an acceptable option. | |
| 120 days after opening | Re-texture/paint guestroom and bath ceilings where stained or peeling as in rooms #102 and #129. | |
| 120 days after opening | Replace/provide artwork. A minimum of two framed pictures with glass fronts. (24" x 30" minimum), and/or one large picture with glass front (30" x 30" minimum). | |
| 120 days after opening | Replace carpet. Company requires minimum 28 ounce cut pile carpet with padding. Carpet must also be wall to wall. Replace floor tiles in kitchen area, as in room #240. Company requires a minimum 8" x 8" ceramic tiles. | |
| 1 year after opening | Replace/provide furniture packages to include leisure and desk chairs. Casegoods must be new upon installation. A minimum of one credenza, 1 framed wall mirror, one headboard per bed, and one free standing night stand for a two bedded room. Two for a single bedded room is required. A writing surface is required to consist of either a desk. | |

Quality Assurance

HOSA

Sent By: Wyndham Hotel Group;          404 240 0962;      Mar-31-08  7:16PM;      Page 14/16
03/28/2008  09:28    42389208          LOAN DEPOT                          PAGE  12/14

## AMS HATTIESBURG INN ON THE HILL, CY RA

**GUESTROOMS**

ROOMS INSPECTED: 102, 112, 132, 140, 156, 167, 229, 219, 240, 249, 226

| DATE COMPLETION | SCOPE OF WORK | For Office Use Only |
|---|---|---|
|  | or an activity table. Two comfortable fabric upholstered chairs per room are required. |  |
| 120 days after opening | Replace/provide lamp package.  Provide two lamps per headboard wall, a credenza lamp and a floor lamp at leisure area. All wall-mounted lamps must have wire covers or molding, loose cords are not acceptable.  Lamp package must be as per and contemporary (i.e. brass). The use of red or other colors of anodized model is not recommended. |  |
| 120 days after opening | Refinish/paint PTAC casings where scuffed or peeling as in room #129. |  |
| 120 days after opening | Replace complete inventory of linen to include sheets (flat and fitted), pillows and pillowcases and complete inventory of terry stock to include washcloths, bath mats and bath and hand towels per new System Standards. |  |
| December 31, 2008 | Replace Bed & bedding with one of the Ramada approved bedding program options (Fitted coverlet, Duvet or Triple Sheet). Contact Design and Procurement Services for program specifications. |  |
| 2 years after opening | Replace existing bedding (mattresses and boxsprings) with Serta Concierge Emerald or Sealy Posturepedic Plush. |  |
| 120 days after opening | Replace draperies.  New draperies must have blackout capabilities, be pleated to double fullness, provide for overlapping of panels and must be both mechanically operated. |  |
| 120 days after opening | Replace clothes racks where tarnished as in rooms #129, #102 and #240. |  |
| 120 days after opening | Replace ironing board covers where burned as in room #229. |  |
| 120 days after opening | Replace refrigerator where rusted as in room #240. |  |
| 120 days after opening | Install a GFCI outlet in all vanity areas where missing as in room #12. |  |
| 120 days after opening | Replace bath doors where damaged as in rooms #112 and #140. Replace bath door hardware (i.e. handles, lever, stoppers and robe hooks). |  |
| 120 days after opening | Replace lavatory/sink units to include "dry" vanities as in room #112. Corian or cultured marble are acceptable replacement options. Laminate finishes are not acceptable. Ensure vanities have adequate skirting and a concealed support system. |  |

Prober Regulations, SIG ECO resolution

**Quality Assurance**

Initial ___

form 13  of 16

Sent By: Wyndham Hotel Group;                     404 240 0962;        Mar-31-08  7:16PM;        Page 15/16

03/28/2008   08:28   4236920              LOAN DEPOT                              PAGE  15/14

| ROOMS INSPECTED COMPLETION DATE | MS. HATTIESBURG INN ON THE HILL CV PA  GUESTROOMS 102, 132, 140, 158, 167, 129, 218, 240, 248, 256  SCOPE OF WORK | For Office Use Only |
|---|---|---|
| 120 days after opening | Replace vanity mirrors where deadraned. | |
| 120 days after opening | Replace vanity light covers where damaged as in room #102. | |
| 120 days after opening | Replace/install plumbing fixtures/trim (sinks and tubs) where tarnished or missing (faucets, drain rings, etc.) as in rooms #102 and #140. | |
| 120 days after opening | Provide Hot & Cold faucet indicators where missing as in room #218. | |
| 120 days after opening | Replace tarnished tissue face plates and toilet tissue catchings. | |
| 120 days after opening | Remove bath walls tiles, install drywall and apply and approved wall finish as in room #129. Company requires either vinyl wallcovering (minimum of 15 ounce) or an approved textured finish. One consistent wall finish is required. | |
| 120 days after opening | Replace bathrooms (towing where entered as in room #218. Company requires minimum 2" single color ceramic tile (recommended 6" x 6" tile) | |
| 120 days after opening | Replace tub/shower surrounds where "colored" or damaged as in rooms #132 and #129. New surrounds must be of a light neutral colored ceramic tile. The installation of a surround system of a synthetic, marble or acrylic is an acceptable option. | |
| 120 days after opening | Remove silicon caulk from bathtubs and re-caulk as in room #112. | |
| Prior to opening | Install Moen Revolution showerheads, the Aura and Angles curved shower rods and Remada specialty Hookless® shower curtains in all bath areas. | |
| 120 days after opening | Provide "Relax Retreat" amenities per System Standards. | |
| Prior to opening | Removal of all previous affiliation guestroom supplies is required. | |

Quality Assurance

Initials: ____

**#45 HATTIESBURG INN ON THE HILL CY #A**

BEDDING INSPECTED  102, 132, 132, 140, 158, 157, 429, 218, 240, 249, 228

GUESTROOMS

| COMPLETION DATE | SCOPE OF WORK | For Office Use Only |
|---|---|---|
| | **FUTURE RAMADA STANDARDS** | |
| March 31, 2008 | Ramada's specially designed and mandated Linen/Terry Reuse Water Savings Program must be implemented. | |
| September 30, 2009 | Compact fluorescent energy saving light bulbs are required to be installed in all areas of the hotel, including guestrooms, lobby and back of the house. | |
| September 30, 2009 | Microwave/refrigerator units are required to be installed in 25% of all guestrooms. New units must be enclosed in cabinetry that matches existing casegoods. | |
| September 30, 2009 | In guest suites that are large enough to accommodate a 17" laptop computer and which use touch pads rather than legs will be mandatory in all guestrooms, with no additional charge to guest. | |
| January 1, 2010 | Currently Ramada requires 27" remote control televisions. However 32" flat panel high definition LCD televisions should be installed in every guestroom by January 1, 2010. 37" flat panel high definition LCD televisions units are highly recommended. | |

Quality Assurance

Page 15 of 15

Initials: _____

**RAMADA WORLDWIDE INC.**
**SCHEDULE C**
**October 2007**

A.    RINA Services Assessment Fee

   The RINA Services Assessment Fee is equal to 4.5% of Gross Room Revenues.  The RINA Services Assessment Fee is subject to change for all Chain Facilities, and new fees and charges may be assessed for new services, but only upon the recommendation of the Executive Committee of RINA and our approval.

B.    RMA Fee

   To provide additional regional marketing services through your RMA, we have established a mandatory "RMA Fee".  The RMA Fee is $15 per guest room per year, up to a maximum of $3,000 per year.  The RMA Fee will be payable before the start of each year on a date we establish and communicate to you at least 60 days in advance, and will be fully earned once the year begins.  The RMA Fee is subject to change for all Chain Facilities, but only upon the recommendation of the Executive Committee of RINA and our approval.  Each RMA may elect to charge supplemental RMA Fees with our approval.

C.    GDS and Internet Booking Fees

   We will charge you under our Central Commission Payment Program either a GDS Fee or an Internet Booking Fee for reservations processed through the global distribution systems ("GDS") or the Internet for your Facility.  The GDS Fee described in Section 7 is $5.15 per reservation processed through any GDS or through any Internet website powered by a GDS.  Internet-originated reservations carry fees of $4.15 per reservation booked through sources other than GDS powered websites, our Chain website, or our direct connection to expedia.com or hotels.com.  We do not charge any fees for reservations booked through our Chain website or through our direct connection to expedia.com or hotels.com.  GDS and Internet-originated reservations also carry a commission if the originator qualifies.  If a guest cancels a GDS or Internet-originated reservation using the same source as was used to originate the reservation, you will not be charged the applicable fee.

D.    Additional RINA Services Assessment Fees or Reservation System Charges

   Agency and other commissions are typically 10% of the Gross Room Revenues generated by each reservation booked by an agency or other qualifying originator, plus our service charge of .5% of commissionable revenue.  Agencies which are part of a travel consortium or a travel management company, including our affiliates, may charge additional commissions of up to 5% and/or participation fees to be included in their programs.  The general sales agent commission (also known as the international sales office commission) is 15% of the Gross Room Revenues generated by each reservation originated in an area served by a general sales agent/international sales office and includes the agency commission.  The "property to property" incentive sales commission is 10% of the Gross Room Revenues generated from each

reservation originated by another Chain Facility through the Central Reservation System, plus our service charge of .75% of commissionable revenue.

We may assess you for additional fees or commissions charged us by distribution channels, travel intermediaries and retailers or for performing other services. By accepting reservations from the GDS, Internet, travel agencies and other intermediaries, you agree to participate in our Central Commission Payment Program and to reimburse us for any fees or commissions we pay to them on your behalf or for Chain Facilities to participate in their programs.

If we suspend Central Reservation System Service because of your default under this Agreement, then you must pay us a Service Interruption Fee of $200 before we restore service.

You must (i) make available through the Central Reservation System and the Chain website room rates equivalent to those offered to the general public by third parties that you authorize to offer and sell reservations for the Facility's guest rooms and (ii) participate in the Chain's Best Available Rate Guarantee Program according to its published requirements. Beginning May 1, 2004 if a guest finds a lower publicly available rate on the Internet than the "Best Available Rate" you offer through the Chain website or the Central Reservation System for the same date and accommodations and the guest meets all Program requirements, you must provide the first room night to the guest without a room charge. You may collect standard incidental fees, charges and taxes. We will also charge you a Processing Fee of $60 to reimburse us for our administrative charges of handling the complaint.

We will offer you the opportunity to participate in certain Internet distribution channel marketing and reservation activity with third parties including our affiliates. Under one type of arrangement, you will offer rooms for sale through an electronic distribution channel on which you will be paid a net, non-commissionable rate if and when the rooms are sold by the distribution channel at its marked-up rate. For providing and managing this activity we may receive commissions from the Internet distribution channels based upon the mark-up or room rates that they receive for renting your rooms. The net rate you receive, not the mark-up retained by the channel, should be included in Gross Room Revenues. We will allocate these commissions to Royalties and RINA Services Assessment Fees in equal proportions. Under another type of arrangement, you will offer rooms for sale through an electronic distribution channel at your best commissionable rate. The distribution channel will not mark-up these rates but will charge you a commission of up to 15% on consumed room nights.

We or an affiliate may charge you a sales agent commission of up to 10% of the Gross Room Revenues generated from consumed reservations booked by members of affinity groups and organizations participating in our Member Benefits sales program. We or our affiliate usually pays a portion of this commission to the affinity group or organization in exchange for promoting the Member Benefits program to its members.

E.     Special Marketing Assessment

We charge a Special Marketing Assessment for your participation in the TripRewards® or successor guest loyalty program. Under TripRewards, program members staying at qualifying rates at Chain Facilities earn their choice of TripRewards points, airline miles or other program currency.

TripRewards points are redeemable for free stays at Chain Facilities and for travel, merchandise, entertainment and other awards.  The Special Marketing Assessment is up to 5% of the Gross Room Revenues accruing from each  qualifying stay at the Facility.  We will proactively match and award members with points or other program currency they earn on qualified stays even if they do not present their TripRewards membership card upon check–in.  You will be billed monthly in arrears for qualifying stays by program members during the preceding month.

F.      Guest Services Assessment

       We will contact you if we receive any guest complaint about you or the Facility, and you will be responsible for resolving the complaint to the satisfaction of the guest.  If you do not resolve any complaint within 7 business days after we refer it to you and the guest contacts us again to seek resolution, we will charge you a "Guest Services Assessment" of $100.00, plus the costs we incur to settle the matter with the guest.  In addition, if the number of guest complaints per 1,000 occupied room nights about you or the Facility in a calendar year exceed the "Annual Facility Allotment" we establish with the approval of the RINA Executive Committee, we will charge you a "Processing Fee" of $60.00 for each additional complaint we receive during that year, regardless of whether you are able to resolve it to the guest's satisfaction.  We may change or eliminate the Guest Services Assessment, the Processing Fee, the Annual Facility Allotment and/or the time for responding to and resolving a guest complaint on a Chain-wide basis at any time upon 30 days advance notice, with the approval of the RINA Executive Committee.  The Guest Services Assessment and the Processing Fee are intended only to reimburse us for the costs of complaint handling and are not intended as penalties or liquidated damages.  All guest complaints remain subject to indemnification under this Agreement.



**To:**      Owners, General Managers and Principal Contacts

**From:**    Keith Pierce, President, Brand Operations, The Americas

**Date:**    March 25, 2010

**Re:**      **Schedule C Fee Changes**

---

Please note that Schedule C to your Franchise or License Agreement has changed, a copy of which is attached.  The major changes are the following:

1. Customer Care Fees (memo attached)
2. Service Charges for travel agent, general sales agent, property to property and similar reservations at your property (previously communicated to you mid-March).

We recommend that you keep the revised Schedule C with your Franchise or License Agreement or other important property records.   Please contact the operations support desk or your director of operations and support with any questions.

Thank you.



**To:**      Ramada® Owners, General Managers and Principal Contacts
**From:**    Keith Pierce, President, Brand Operations, The Americas
**Date:**    March 25, 2010
**Re:**      Customer Care Program Changes

---

Customer complaints are inevitable – the key to recovering these customers is the speed and effectiveness of efforts to resolve them. Thankfully, enhancing performance in problem resolution does not require a capital investment, and doing so can create a competitive advantage. Today, more than ever, consumers across all segments of our business are making buying decisions based on experience – their own and others – such as reviews found on TripAdvisor and other online consumer forums. Here are a few facts that highlight the importance of problem resolution:

- It is easier, less costly to keep an existing consumer vs. capturing a new one.
- "Highly satisfied" guests across all business segments are six times more likely to return than merely "satisfied" guests.
- Consumer perception is reality; social media outlets make those perceptions viral.
- 95% of consumers in general will return if they feel their complaint was resolved quickly, ideally before they departed.
- Timely response and resolution of guest complaints, <u>before</u> they're escalated to "customer care" can boost guest satisfaction and reduce your expenses.

Accordingly, to align our Customer Care program with the needs and expectations of today's consumers, we will implement the following changes to our Customer Care program as of May 31, 2010.

✓   Response Time:   Reduced from seven to three business days, after which Customer Care will take action to resolve, and charge the property a customer care fee (noted below). The property will be responsible for expenses which Customer Care deems necessary to effectively resolve the valid complaint.

✓   Allotments:  Will be eliminated. These changes effectively provide unlimited allotments to properties that address (ie. engage, document, resolve) WynCare cases within three business days.

✓   <u>Fees</u>
- Processing Fees:  elimination of the $60 processing fee associated with valid complaints.
- Best Rate Claim:  properties will continue to be charged a processing fee of $60.00 for valid best rate claims.
- Customer Care Fee:   a $160.00 fee will apply in each instance when a property fails to address and resolve a complaint case received via WynCare within three business days.

Please see the FAQs below for further details. Schedule C to your Ramada Franchise or License Agreement has been revised to reflect these and previously communicated updates. A copy is enclosed for your records.

In summary, processing fees and allotments will be eliminated, response time will be three business days and the Customer Care Fee of $160 will be levied for failing to resolve a customer complaint within three business days. These changes align our customer care program with our competition and reflect our commitment to improving consumer satisfaction through timely and effective problem resolution. As always, we appreciate your hard work and dedication to lifting customer satisfaction.

If you have any questions, please contact the Operations Support Desk at (800) 221-7312 or your director of operations and support.

### NEW CUSTOMER CARE FEES
### FREQUENTLY ASKED QUESTIONS

1. Will Customer Care resolve all open cases after three business days?
   *If a property has not entered adequate details (efforts to contact, nature of dialogue, steps to be taken to achieve resolution) in the case via WynCare, Customer Care will contact the guest and resolve any open case after the three business days have passed. The property will be charged the cost of compensation to resolve the issue and a $160.00 Customer Care fee. In special circumstances (ie. the guest is unreachable for more than three business days, and the guest corroborates this fact), Customer Care may in its discretion extend the time frame for resolution.*

2. What happens when a guest contacts Customer Care with an invalid issue? *As has been the practice, Customer Care will document the guest complaint in WynCare, thereby initiating a case for the property to address. Assuming the property effectively addresses the case, documenting that the case is invalid, Customer Care will support the property unless information from the guest indicates the validity of the case.*

3. Why is the fee $160.00?
   *The fee is intended to encourage timely response and resolution, and is comparable to most competitors.*

4. Why have allotments been eliminated?
   *To create greater accountability to resolve guest complaints at the property level. In fact, allotments are no longer needed as they've become in essence "unlimited" for those properties that respond and effectively address complaints directly with the guest as per this revised program.*

5. Why is there a decrease in resolution time?
   *To align our efforts to respond and resolve issues with current industry standards.*

6. What happens if I cannot access MyPortal and am not able to respond in the three days required?
*It is important to empower your team members to view alerts on MyPortal so they can resolve issues even in your absence. If you are experiencing MyPortal access issues, please contact the Operations Support Desk immediately.*

7. What happens if I don't close the case in MyPortal?
*If the property has not closed the case per the revised program, the open case will be considered unresolved and Customer Care will take action to resolve the case with the guest.*

8. What if a guest calls Customer Care after the issue is resolved on property?
*Customer Care will refer to the resolution you recorded in the case and if the resolution was appropriate, Customer Care will take no further action. If the guest is upset with the property resolution, Customer Care will evaluate the issue on its merits and if appropriate, take steps to resolve and charge your property the cost of resolution.*

9. What happens to cases that were opened prior to May 31, 2010, and a guest calls Customer Care for a resolution?
*Cases opened prior to May 31, 2010 will be handled under the terms of the prior Customer Care policy, including resolution time and charges.*

10. When do the three business days begin, once a case has been opened?
*The three business days start from the first business day after the case was posted to WynCare. Example: Customer Care opens a case and posts the case to WynCare on Monday. The first business day is Tuesday, the second business day is Wednesday, the third business day is Thursday. On Friday, the three business days are past and Customer Care will begin resolving it then.*

11. Are there any changes to the Best Rate Claim processing fee?
*Rate parity continues to be of high importance. Properties will continue to be charged a processing fee of $60.00 for valid best rate claims.*

12. Will training be made available on the revised Customer Care Program?
*Yes, training will be made available.*

**RAMADA WORLDWIDE INC.**
**SCHEDULE C**
**March 2010**

**I.     RINA Services Assessment Fee**

The RINA Services Assessment Fee consists of the "Marketing Contribution" and the "Basic Reservation Fee." The Marketing Contribution is 2.5% of Gross Room Revenues; the Basic Reservation Fee is 2% of Gross Room Revenues. The RINA Services Assessment Fee is subject to change for all Chain Facilities, and new fees and charges may be assessed for new services, but only upon the recommendation of the Executive Committee of RINA and our approval.

**II.     RMA Fee**

To provide additional regional marketing services through your Ramada Management Association or RMA, we have established a mandatory "RMA Fee". The RMA Fee is $15 per guest room per year, up to a maximum of $3,000 per year. The RMA Fee will be payable before the start of each year on a date we establish and communicate to you at least 60 days in advance, and will be fully earned once the year begins. The RMA Fee is subject to change for all Chain Facilities, but only upon the recommendation of the Executive Committee of RINA and our approval. Each RMA may elect to charge supplemental RMA Fees with our approval.

**III.     Additional Fees**

**A.     Loyalty Program Charge**

We charge a Loyalty Program Charge for your participation in the Wyndham Rewards or successor guest loyalty program. The Loyalty Program Charge is up to 5% of the Gross Room Revenues accruing from each "qualifying stay" at the Facility as defined in the Front Desk Guide or any other program rules. We will proactively match and award members with points or other program currency they earn on qualified stays even if they do not present their Wyndham Rewards membership card upon check–in. You will be billed monthly in arrears for qualifying stays by program members during the preceding month.

**B.     Customer Care Fee**

We will contact you if we receive any guest complaint about you or the Facility, and you will be responsible for resolving the complaint to the satisfaction of the guest. If you do not respond to and resolve any complaint to the guest's satisfaction within three business days after we refer it to you, we will charge you a "Customer Care Fee" of $160.00, plus the costs we incur to settle the matter with the guest. The Customer Care Fee is intended only to reimburse us for the costs of complaint handling and is not intended as penalties or liquidated damages. In addition, we may respond to customer complaints posted on third-party travel websites, blogs and similar forums, at our discretion, if you do not promptly address them to the satisfaction of the guest. All guest complaints remain subject to indemnification under this Agreement.

**C.    Best Available Rate Program**

You must (i) make available through the Central Reservation System and any current or future consumer websites that we or our affiliates develop (the "Chain Websites") room rates equivalent to those offered to the general public by third parties that you authorize to offer and sell reservations for the Facility's guest rooms and (ii) participate in the Chain's Best Available Rate Guarantee Program according to its published requirements. If a guest finds a lower publicly available rate on the Internet than the "Best Available Rate" you offer through any of the Chain Websites or the Central Reservation System for the same date and accommodations and the guest meets all Program requirements, you must provide the applicable night(s) to the guest at 10% less than the lower rate offered on the Internet. You may collect standard incidental fees, charges and taxes. We will also charge you a Processing Fee of $60 to reimburse us for our administrative charges of handling the complaint.

**D.    Service Interruption Fee**

If we suspend Central Reservation System Service because of your default under this Agreement, then you must pay us the Service Interruption Fee set forth in the System Standards before we restore service.

**E.    GDS and Internet Booking Fees**

We will charge you under our Central Commission Payment Program either a GDS Fee or an Internet Booking Fee, as applicable, for reservations processed through the global distribution systems ("GDS") or the Internet for your Facility. GDS Fees are assessed for reservations processed through any GDS or through any Internet website or other booking source powered by a GDS. Internet Booking Fees are assessed for any other Internet-originated reservations. We do not currently charge any fees for reservations booked through our Chain website or through our direct connection to on-line travel agents but may do so in the future. If a guest cancels a GDS or Internet-originated reservation using the same source as was used to originate the reservation, you will not be charged the applicable fee. GDS and Internet-originated reservations may also incur travel agent and similar commissions. We will establish the amount of the GDS and Internet Booking Fees from time to time based on a weighted average of the fees these distribution channels charge us plus a reasonable overhead charge to cover costs with providing these services.

**F.    Travel Agent Commissions and Other Distribution Charges**

Travel agent and other commissions are typically 10% of the Gross Room Revenues generated by each reservation booked by an agency or other qualifying originator, plus our service charge of .75% of commissionable revenue. Agencies which are part of a travel consortium or a travel management company may charge additional commissions and/or participation fees to be included in their programs. The general sales agent commission (also known as the international sales office commission) is 15% of the Gross Room Revenues generated by each reservation originated in an area served by a general sales agent/international sales office and includes the travel agent commission. The "property to property" incentive sales commission is 10% of the Gross Room Revenues generated from each reservation originated by another Chain Facility through the Central Reservation System, plus our service charge of .75% of commissionable revenue.

We or an affiliate may charge you a sales agent commission of up to 10% of the Gross Room Revenues generated from consumed reservations booked by members of affinity groups and organizations participating in our Member Benefits sales program. We or our affiliate usually pays a portion of this commission to the affinity group or organization in exchange for promoting the Member Benefits program to its members.

We will offer you the opportunity to participate in certain Internet distribution channel marketing and reservation activity with third parties. Under one type of arrangement, you will offer rooms for sale through an electronic distribution channel on which you will be paid a net, non-commissionable rate if and when the rooms are sold by the distribution channel at its marked-up rate. For providing and managing this activity we may receive commissions from the Internet distribution channels based upon the mark-up or room rates that they receive for renting your rooms. The net rate you receive, not the mark-up retained by the channel, should be included in Gross Room Revenues. We will allocate these commissions to Royalties and RINA Services Assessment Fees in equal proportions. Under another type of arrangement, you will offer rooms for sale through an electronic distribution channel at your best commissionable rate. The distribution channel will not mark-up these rates but will charge you a commission of up to 15% on consumed room nights.

We may change, modify or delete Additional Fees for existing services and programs and add new Additional Fees for new services and programs at any time upon not less than 30 days written notice.

# EXHIBIT B

Location: HATTIESBURG, MS
Site: _23733_

## CONNECTIVITY EQUIPMENT LEASE AND SERVICES ADDENDUM
## NEW FRANCHISEES

This Connectivity Equipment Lease and Services Addendum (the "Addendum") by and between Ramada Worldwide Inc. ("we," "our," "us") and **INN ON THE HILL HATTIESBURG, LLC** ("you," "your") is dated _3/31_, 2008 (the "Addendum Effective Date"). This Addendum is part of the License or Franchise Agreement (the "Agreement") between you and us.

Notwithstanding anything to the contrary set forth in the Agreement, the following provisions shall supercede and apply:

1. <u>Services</u>. Our affiliate has entered into an agreement with a broadband communications services supplier ("Supplier") under which we are authorized to provide our franchisees or licensees with broadband connectivity services. The specific broadband communications services ("Services") and related equipment necessary for the proper functioning of the Services ("Equipment") are listed in Schedule 1 of this Addendum. We and/or Supplier will lease to you the Equipment and furnish you the Services (the Equipment and Services are collectively referred to as the "Property Communications System") for the Facility. Once installed, you will access the Central Reservation System, the Enterprise Data Warehouse, the Email Network and the Brand Information Source (as those terms are defined in the Software and Services Agreement) using only the Property Communications System while this Addendum remains in effect.

2. <u>Site Inspection</u>. You will reasonably cooperate with us and Supplier to determine how the Equipment will be installed. You will furnish us or Supplier with any information requested in order to complete the installation. We or Supplier, in our sole discretion, will determine the placement of the Equipment at the Facility, which is intended to ensure the optimal performance of the Services.

3. <u>Installation</u>.

(a) Supplier will schedule installation of the Equipment at the Facility during regular business hours, when possible. As a condition to the lease and installation of the Equipment at the Facility, you must follow any instructions we or Supplier provide you to prepare the Facility for installation and be ready to accept the Equipment on the scheduled installation date.

(b) You will allow installation personnel reasonable access to all areas of the Facility necessary to perform the installation. You will obtain in advance, if necessary, any required permits, approvals or consents from any governmental authority, your landlord or mortgagee to install the Equipment at the Facility, including access to the premises of a third-party, if necessary, to complete the installation. You will permit the installation of certain Equipment on the roof or attached to the exterior walls of the Facility. You

RAMEXCl
216571 03/07

will furnish to the installation personnel, free of charge, adequate electrical power, local telephone service, water and other utilities necessary to perform the installation.

(c)  The Property Communication System includes a dial-backup feature.  To support this capability, you must maintain either a dedicated telephone line as provisioned by your local telecommunications provider or a dedicated analog PBX extension configured with dial-out only services.

(d)  If you comply with the provisions of this Section 3 and our instructions for preparing the Facility for installation of the Equipment on your scheduled installation date, there will be no charge for a "Standard Installation" as defined in Schedule 1.  If your installation involves equipment, cabling, hardware or labor, beyond what is included in the Standard Installation package, you must pay the additional fees and charges set forth in Schedule 3, plus an administrative charge of no more than $50.00.    If (i) you postpone a scheduled installation with less than seven (7) days prior written notice to us, or (ii) an installation is delayed or aborted because you did not comply with this Section 3 (collectively, a "Cancellation"), you will pay us an Installation Cancellation Charge of $1,000.00 within five (5) days after our written notice to you.  If a second Cancellation occurs, you will be in default under this Addendum.

4.  Operations; Authorizations.

(a)  Once installed, you will not move the Equipment without our prior written consent.  You will maintain the Equipment according to the environmental conditions we specify.  Upon reasonable prior notice, you will give us or Supplier reasonable access to inspect the Equipment.

(b)  You will maintain, at your expense, any necessary permits and licenses required for your use of the Property Communications System.

(c)  After the "Start Date," as defined in Section 6 below, we will provide through Supplier the Services during the Term so long as you are not in default under this Addendum, the Agreement or any other agreement between you and us or our affiliates.

5.  Support and Maintenance.  After the Equipment is installed and Service commences, we will provide you a toll-free number for reporting Property Communications System problems.  You will contact the number promptly when and if you experience any problems with the Property Communications System, or if any casualty affects the Property Communications System.  We or Supplier will work with you to determine if the problem requires support or maintenance services.  The support and maintenance services we or Supplier will provide you are listed in Schedule 2 to this Addendum.  You will allow maintenance personnel reasonable access to all areas of the Facility necessary to perform these support and maintenance services.

6.  Monthly Service Charges.  You will pay to us for the Property Communications System a "Monthly Service Charge" of $150.00 for the period beginning on the Start Date and ending at the end of 36 full months after the Start Date.  The "Start Date" is the date the Equipment has been installed at the Facility and it begins operating.  Charges will begin to accrue on the Start

RAMEXC1
216571 03/07

Date. We will invoice you for the Monthly Service Charge in advance each month. We will charge you a pro-rated amount of the Monthly Service Charge for the portion of a calendar month in which the Start Date occurs if it is not the first day of the month. You will pay the invoice amount to us upon receipt. You will also pay any excise, sales, use, state personal property tax or other taxes assessed in connection with the Property Communications System. We may apply any amounts received to any outstanding invoices in any order. We may, after we give you at least 30 days advance written notice, increase the Monthly Service Charge during the term of this Addendum by an amount that reflects the actual price increase to us in the rates Supplier charges us for the Property Communications System and/or our increased costs of providing any related support or maintenance services.

7. <u>Term</u>. This Addendum will be effective from the date of execution by you and us and shall continue in full force and effect for a period (the "Initial Term") ending on the last day of the thirty-sixth (36th) month, starting on the first day of the month following the Start Date, unless earlier terminated in accordance with the terms of this Addendum or the Agreement. At the end of the Initial Term, this Addendum shall renew (a "Renewal Term") on a quarterly basis until either you or we give written notice of termination to the other party at least ninety (90) days before the end of the Initial Term or any subsequent Renewal Term.

8. <u>Software</u>.

    (a) We assign to you Supplier' non-exclusive licenses to use the operating systems in connection with the Property Communications System (the "Software"), subject to the conditions and limitations in this Addendum and the Software licenses. The Software may be used only in conjunction with the Equipment at the Facility, at no other location, and for the sole purpose of obtaining the Services in connection with the operation of your franchise with us. You may not disclose, reverse engineer, alter, add to, modify or copy the Software for any reason. You may not, directly or indirectly, distribute, sell, assign, transfer, offer, disclose, lease or license the Software to a third party.

    (b) Title to and ownership of the Software shall remain with us or those entities that have authorized us to sublicense and use them, free of any claim or right of yours or the holder of any security interest, lien or encumbrance on the Facility or any of your other property. If any person attempts to establish any legal right in the Software, you will promptly notify us in writing.

9. <u>Title to Equipment; Risk of Loss; Insurance</u>. You are leasing the Equipment and have no right, title, or interest in it other than as specified in this Addendum. The Equipment is not intended to be a fixture or permanently attached to any real property. You will not allow any security interest, landlord's lien, or any other lien or encumbrance to be placed on or attach to the Equipment. If any person attempts to establish any legal right in or to the Equipment, you will promptly notify us in writing. We or Supplier may, at our or their option, mark, label or otherwise identify the Equipment. You will not remove or deface such identification. You bear the entire risk of loss, theft, damage or destruction of any installed Equipment from any causes whatsoever, unless we or Supplier directly caused the loss, damage or destruction. You will promptly notify us if the Equipment is damaged for any reason. You will maintain "all-risk" fire and extended casualty (including any acts of nature such as lightning, wind, rain, snow, flood,

40

fire and hail) insurance for the Equipment during the Initial Term and any Renewal Term of at least $25,000, and you name us, Wyndham Worldwide Corporation, Wyndham Hotel Group, LLC, their successors and assigns as additional insureds and loss payees. You will furnish us, prior to installation of the Equipment, with a certificate of insurance showing the insurance coverage is in effect, the named insured and additional insureds. You must furnish us with an updated certificate of insurance each year when renewed and every time a change is made in your insurance policy or insurance carrier.

10.  Force Majeure. If performance by you, Supplier or us is delayed or prevented because of strikes, inability to procure labor or materials, defaults of suppliers or subcontractors, delays or shortages of transportation, failure of power or telephone transmissions, restrictive governmental laws or regulations, weather conditions, or other reasons beyond the reasonable control of the party, then performance of such acts will be excused and the period for performance will be extended for a period equivalent to the period of such delay. Delays or failures to pay resulting from lack of funds will not be deemed delays beyond your reasonable control.

11. No Warranties; Security; Indemnity.

   (a)  WE MAKE NO WARRANTY WHATSOEVER, EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY ABOUT THE PROPERTY COMMUNICATIONS SYSTEM, ITS MERCHANTABILITY, AND ITS FITNESS FOR ANY PARTICULAR PURPOSE, OR ITS CONFORMANCE TO SPECIFICATIONS OF ANY ORDER OR DOCUMENTATION.

   (b)  We do not warrant any connection to or transmission over the Property Communications System, other than as specified in this Addendum. Your use of any information obtained through the Services is at your own risk. We deny any responsibility for the accuracy or quality of the information obtained through the Services. We do not warrant that the Property Communications System will operate uninterrupted or error-free.

   (c)  You may not use the Property Communications System to take any actions or make any statements that (i) infringe on another party's copyright, patent, trademark, trade secret or other proprietary rights or rights of publicity or privacy; (ii) violate any applicable law, statute, ordinance or regulation; (iii) are defamatory, trade libelous or threatening; (iv) are pornographic or obscene; (v) violate any laws regarding unfair competition, discrimination or false advertising; (vi) result in the distribution of viruses, Trojan horses, worms, time bombs, cancelbots, chain letters or other similar harmful or deleterious programming routines; or (vii) result in the unauthorized entry to any other network, machine or device accessible through the Services. You are responsible for all content transmitted from the Property Communications System using the Services.

   (d)  You are responsible for user access security for the Property Communications System, and any unauthorized use of the Property Communications System. You must authorize and supervise the users of the Property Communications System.

(e) We or Supplier may, at our sole discretion, institute security controls on the Services to protect the confidentiality, privacy, integrity and availability of your information and our information. These controls may include without limitation (i) requiring users to utilize unique identification and authorization; (ii) limiting certain levels of access to persons you authorize; (iii) implementing access controls on all data, software or other file-system objects to limit access to only authorized users; (iv) ensuring the integrity of all data stored or processed; and/or (v) preventing the loss of data processed or transferred.

(f) You acknowledge that the Property Communications System is specifically authorized for the Facility's commercial use only, and is not intended for personal Internet use by your personnel or Chain guests. You further acknowledge that the primary function of the Property Communications System is to provide connectivity to and from the Central Reservation System, the Enterprise Data Warehouse, the Email Network and the Brand Information Sources. We or Supplier may, at our sole discretion, institute filters, screens, traps or other devices on the Services and block certain Internet content from being received at or transmitted from the Facility.

(g) You will indemnify and hold harmless us, our affiliates, successors and assigns and each of the respective directors, officers and employees associated with them against all claims of employees, agents, guests, and all other persons and entities, arising out of or in connection with your operation, use or non-use of the Property Communications System, including any content disseminated from the Property Communications System at the Facility. We will not be liable to you or any other person or entity for personal injury, personal loss or property loss, including but not limited to, damage to the Facility, as a result of your operation, use or non-use of the Services and/or Equipment.

12. Default; Termination; Attorney's Fees.

(a) If you are in default under Section 11.1 of the Agreement, or any one of the events described in Section 11.2 of the Agreement that gives us the right to terminate occurs, or you are in default of this Addendum, or the Equipment becomes inoperable by your act or omission, or you assign or transfer, or attempt to assign or transfer the Services or Equipment without our consent, except as permitted under the Agreement, then to the extent permitted by applicable law, we shall have the right to suspend the Service and use of the Equipment, while the default remains uncured. Additionally, we may, at our option, immediately terminate only this Addendum and not the Agreement, upon written notice to you, if (i) you commit a default under Section 11(c) of this Addendum above, (ii) you attempt to obtain an interest in, or assist another person or entity to obtain an interest in, the Hardware or the Software in violation of Section of 8(b) or 9 of this Addendum above, or (ii) you commit any other default of this Addendum and fail to cure such default within thirty (30) days after you receive notice of the default.

(b) Upon the termination of this Addendum for any reason, you will permit us and/or Supplier reasonable access to Facility to remove the Equipment. YOU EXPRESSLY WAIVE ANY RIGHT TO NOTICE OF OR A HEARING WITH RESPECT TO REPOSSESSION AND CONSENT TO ENTRY INTO THE FACILITY BY US,

SUPPLIER, OUR OR THEIR AGENTS OR REPRESENTATIVES TO REMOVE THE EQUIPMENT WITHOUT JUDICIAL PROCESS. If you fail or refuse to permit the peaceable entry to take possession of any Equipment, you will be liable for rental of the Equipment at the rate of Five Hundred Dollars ($500.00) per week from the date that we first attempt to retake it.

(c) If we terminate this Addendum under Section 12(a) above, or in the event of any other early termination of this Addendum, you will pay us "Addendum Liquidated Damages". Addendum Liquidated Damages are equal to the greater of the following amounts: (i) Two Thousand Five Hundred Dollars ($2,500.00), or (ii) the product obtained by multiplying the number of full and partial months remaining in the Term of the Addendum by the Monthly Service Charge in effect on the termination date. Addendum Liquidated Damages are in addition to (i) the stipulated loss value of the Equipment, as determined by Supplier, if you do not return the Equipment to us or Supplier upon termination of this Addendum, (ii) any accrued but unpaid fees or amounts due us, and (iii) any de-installation fees set forth in Schedule 3. You and we acknowledge that actual damages are difficult or impossible to ascertain on the Addendum Effective Date, and the amount of the Addendum Liquidated Damages is a reasonable pre-estimate of the damages that will be incurred and is not a penalty. Our right to receive other amounts due under the Agreement and this Addendum is not affected by the payment to us of Addendum Liquidated Damages or vice versa.

(d) The non-prevailing party will pay the costs and expenses, including reasonable attorneys' fees and the expenses, incurred by the prevailing party to enforce this Addendum.

IN WITNESS WHEREOF, the undersigned have executed this Addendum as of the date set forth above.

**WE:**
**RAMADA WORLDWIDE INC.**

By: _____
            (Vice) President

**YOU, as licensee:**
**INN ON THE HILL HATTIESBURG, LLC**

By: _____
            Manager

## SCHEDULE 1 (NEW SITES)
## SATELLITE SERVICES AND EQUIPMENT

A. The Services. The Services are full duplex point-to-multipoint satellite communications between the shared hub (the "Hub") of Hughes Network Systems, Inc. ("HNS") and the Facility, providing network connectivity to support the following base services: property management system access to the Central

Reservation System, the Electronic Data Warehouse, the Email Network and access to the Brand Information Source. The Services include the following:

1) Provision and operation of the Hub by HNS on a 24 hour per day, 365 day per year basis.

2) Built-in redundancy to ensure a higher level of service availability via dial-backup capability in the event of satellite signal interruption. This is referred to as Virtual Automatic Dial Backup (VADB). This does not include the local access line.

3) Provision and operation of the space segment of HNS's satellite, including its satellite transponder capacity.

4) Connectivity Service Level A (Optional Service Level plans are available. See Schedule 3 or explanation).

B. <u>The Equipment</u>. The Equipment includes standard equipment and installation as described below. Standard installations cover Facilities 1 - 2 stories from the ground and include the following:

- Dual IFL (inter-facility link) antenna cable run up to 150 feet from antenna location to Indoor Unit location.
- Wall fish and wire mold as deemed necessary by the installer.
- The use of necessary tools, including laptop computer and appropriate commissioning software, to install, commission, test and cutover HNS and customer systems.
- Electrical grounding of antenna mount per HNS guidelines.
- Activation and commissioning of the satellite system.

The standard installation excludes efforts to structurally reinforce walls or roofs, landscaping, tree removal, excavation into pavement for cable conduit, roof penetrations, or restricted roof access requiring cranes or helicopters. It also excludes sites that have unusual characteristics or require special installation, handling or equipment. (Additional costs may apply for non-standard or "exceptional Facilities". See Schedule 3.)

Standard equipment consists of:

- HN7700-S indoor unit with two active 10/100BaseT ports, internal modem with RJ-11 interface (for Virtual Automatic Dial Backup)
- 2.0 Watt RF Outdoor Equipment
- .98m diameter antenna (larger sized reflectors may have been installed based on geographic location of Facility as determined by HNS.)
- antenna mount (non-penetrating roof mount, tri-mast wall mount, or ground mount)
- IFL (Inter-Facility Link) antenna cable
- 8-port Ethernet switch
- two (2) 25-foot cables for connection of up to (2) devices
- Ethernet data cable to connect to the Indoor Unit.

- HNS may install, at its sole discretion anti-icing equipment to protect the equipment at the Facility at no additional cost if the Facility is located in a 10-day ice zone. This includes Facilities which require new outdoor equipment. Ice zone is determined by HNS. If anti-icing equipment is installed, you must provide at your expense and prior to

the installation date, a source of 110V, GFCI 20 amp non-dedicated AC power that is readily available at the antenna site.  If it is determined that anti-icing equipment is not necessary due to the location of the Facility, you may request to have it installed at your cost (see Schedule 3).  That request must be made in advance of the installation so that final pricing can be quoted.

**SCHEDULE 2**
**SUPPORT AND MAINTENANCE**

You will receive the following maintenance and support services:

    1) Telephone Support. You may contact our Tech Support center 24 hours per day, 365 days per year by calling a toll-free telephone access to receive Service support.

    2) Corrective Maintenance. If Tech Support and HNS determine that the Equipment is not operating properly, Tech Support and/or HNS will restore the Equipment to good working condition by performing the following corrective maintenance as required:

        a) Diagnostic testing to determine the existence and cause of the malfunction;
        b) Removal and replacement of any malfunctioning field replaceable Equipment ;
        c) Reorientation (repointing) of the antenna subsystem;
        d) Repair or replacement of Equipment interconnecting cables;
        e) Reloading initializing instructions and recommissioning;
        f) Verification of proper operation and completion of service report; and
        g) Notification to you and the control center that the Equipment has been restored to operational status.

    3) Limitations. Maintenance services do not include any of the following services:

        a) Maintenance, repair or replacement of parts damaged or lost through catastrophe, accident, lightning, wind, theft, misuse, vandalism, fault or negligence of you, your employees or agents or causes external to the Equipment, including failure of, or faulty, electrical power or air conditioning, operator error, failure, or malfunction of data communication we or HNS did not provide you, or from any cause other than intended and ordinary use;

        b) Changes, modifications, or alterations in or to the Equipment by anyone other than HNS or us other than HNS approved upgrades and configuration changes; or

        c) Deinstallation, relocation, or removal of the Equipment or any accessories, attachments, or other devices.

    4) Software Maintenance. HNS will correct reported defects in the Software that cause it not to substantially perform in accordance with its applicable specifications, as promptly as commercially reasonable.

    5) Software Maintenance Service Limitations. We and HNS have no responsibility to correct any defects in any Software that are caused by (i) modification of the Software by any person other than us or HNS; (ii) failure to install an update provided by us or HNS within 60 days after we or HNS provide it to you; (iii) misuse or improper installation by you; or (iv) problems in third-party hardware, software, or networking equipment which is manipulated by, interoperates with, or operates in conjunction with the Software.

**SCHEDULE 3**
**ADDITIONAL FEES AND OPTIONAL AND NON-STANDARD CHARGES**

- Expedited Satellite Installation at Customer's request          $750 each
  - Requested with less than 15 business days notice
  - Charge is waived if HNS does not meet the requested date

- Aborted or Cancelled Installation                              $1000 each
  - Charge will only apply in cases where the Installation has been cancelled or postponed by Customer within seven (7) days of the scheduled installation.  (See Section 3(d) of Addendum above.)

- Deinstallation of nonpenetrating mount site (satellite)       $750 each

- HN7700 Site Relocation                                        $1500 each
  - Assumes same city deinstall/reinstall within 72 hours
  - If not, add $170 for storage and shipping

- Additional coaxial IFL cable for satellite antenna (150 feet included in standard installation)                                             $1.00 per foot

- Optional Anti-Icing antenna system (where Facilities are outside of 10-day ice zone and anti-icing equipment is requested)
  - For .98m antenna with anti-icing           $1850
  - For 1.2m antenna with anti-icing           $1900

- Satellite Service Plan.  The standard connectivity service level as described in Schedule 1, Paragraph A(4) (Service Plan A) provides the initial bandwidth necessary to access the systems and services mentioned therein.  Upgraded service plans are available to support a) a Facility request for additional bandwidth, or b) in the event that network monitoring audits indicate that Facility network usage requires a service plan upgrade, you will be advised to either upgrade to the next level plan at your cost or alter network usage habits.  The costs for these optional service plans are:
  - Incremental Charge for upgrade to Service Plan B       $15.00 per month
  - Incremental Charge for upgrade to Service Plan C       $46.00 per month

- Demand Services Rate

  You shall be charged on a Time & Material (T&M) basis for out of scope Services which are not described elsewhere in this Schedule 3.  This includes, but is not limited to, repairs required for the reasons set forth in Schedule 3, Section 3   The T & M charges are as follows:

  Hourly Rate
  - Normal Hours (8am-5pm local time, Monday-Friday)       $125 per hour
  - After Hours Weekday (5pm-8am, Monday-Thursday)         $150 per hour
  - Weekend (5pm Friday–8am Monday)                        $150 per hour

RAMEXC1
216571 03/07

Travel Charge (flat rate per call)                    $225

- Special Equipment Charges

    In the event that special equipment is required for maintenance (including, but not limited to scaffolding and power lift trucks), it will be provided by HNS, if practical, and Customer will be billed for the actual cost to HNS plus 15%.   At Facilities requiring special equipment for physical access, onsite repair time will be billed at prevailing rates for Demand Services specified above.

- Non-Standard/Exceptional Facility

    In the event that a Facility has unusual characteristics or HNS is requested to provide installation services that will require special handling or additional equipment, such as additional cabling, the Facility shall be subject to non-standard installation charges.

# EXHIBIT C

SAM PATEL

PAGE 01

LOAN DEPOT

03/23/2006  09:21    4238920848

## GUARANTY

To induce Ramada Worldwide Inc., its successors and assigns ("you") to sign the License Agreement (the "Agreement") with the party named as the "Licensee," to which this Guaranty is attached, the undersigned, jointly and severally ("we," "our" or "us"), irrevocably and unconditionally (i) warrant to you that Licensee's representations and warranties in the Agreement are true and correct as stated . . . (ii) guaranty that Licensee's obligations under the Agreement, including any amendment . . . . . . . . unconally paid and performed.

Upon default by Licensee and notice from you we will immediately make each payment and perform or cause Licensee to perform, each unpaid or unperformed obligation of Licensee under the Agreement. Without affecting our obligations under this Guaranty, you may without notice to us extend, modify or release any indebtedness or obligation of Licensee, or settle, adjust or compromise any claims against Licensee. We waive notice of amendment of the Agreement. We acknowledge that Section 17 of the Agreement, including Remedies, Venue and Dispute Resolution, and WAIVER OF JURY TRIAL, applies to this Guaranty.

Upon the death of an individual guarantor, the estate of the guarantor will be bound by this Guaranty for obligations of Licensee to you existing at the time of death, and the obligations of all other guarantors will continue in full force and effect.

This Guaranty may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one in the same instrument.

IN WITNESS WHEREOF, each of us has signed this Guaranty effective as of the date of the Agreement.

GUARANTORS:

_____ (Seal)
Nitan Shah

_____ (Seal)      Gul.
Ghanşam Patel

Ghanshyam Patel

RAMINC1
216571 03/07

35

# EXHIBIT D



**WYNDHAM**

HOTEL GROUP

Compliance Department
22 Sylvan Way
Parsippany, New Jersey 07054
Ph (973) 753-6000 ● fax (800) 880-9445
www.wyndhamworldwide.com

June 29, 2011

**VIA 2 DAY DELIVERY METHOD**

Mr. Nick Sheth
Inn on the Hill Hattiesburg, LLC
6702 Heritage Business Court
Chattanooga, TN 37421

Re:    **ACKNOWLEDGEMENT OF TERMINATION** of the License for Ramada® System Unit
#23733-73285-01 located in Hattiesburg, MS ("Facility")

Dear Mr. Sheth:

Ramada Worldwide Inc. ("we" or "us") has received information advising us that Inn on the Hill Hattiesburg, LLC ("you" or "your") stopped operating the Facility. Accordingly, we acknowledge that the License Agreement, dated March 31, 2008 (the "Agreement"), has terminated, effective January 3, 2011 (the "Termination Date").

The Agreement requires you to perform certain post termination obligations.  In addition to other obligations specified in the Agreement, by no later than ten days after the date of this letter, you must (a) remove all signage and other items bearing the Ramada Marks; (b) perform all post-termination obligations specified in the Systems Standards Manual; (c) change all signs, billboards, and listings in telephone directories, travel guides, hotel indexes and similar materials in which the Facility is identified as a Ramada facility; and (d) remove the Ramada Marks from any advertising or promotional activities on, around or directed towards the Facility, including any web sites, web pages or search engines. You must cooperate fully with us regarding any post-termination inspections by us to verify that the Facility has been properly de-identified.  You must immediately return to us all training documents, operating manuals and other proprietary material.

Because you terminated the Agreement prematurely, you must pay us Liquidated Damages in the amount of $119,000.00, as specified in Section 18.4 of the Agreement. You must also pay Damages of $2,500.00 for termination of the Addendum to the Agreement for Satellite Connectivity Services (the "Addendum"), plus any additional fees and charges as per Schedule 3 of the Addendum.  The Addendum also terminated on the Termination Date. You must also pay any outstanding Recurring Fees and any other fees and charges through the date you complete the de-identification of the Facility. We estimate that, as of the date of this letter, you owe us $86,455.34 in such fees and charges.  Please pay us this amount within fourteen days.  Please consider this letter to be a notice and demand for payment under any Guaranty of the Agreement, directed to all of your Guarantors.



WYNDHAM
HOTEL GROUP

     

       

Mr. Nick Sheth
June 29, 2011
Page Two

If you have any questions, please contact Larry Geer, Sr. Director of Settlements, at (973) 753-7131.

Sincerely,

Valerie Capers Workman
Vice President
Compliance & Government Relations

Enclosure

cc:     Ghanshyam Patel (Guarantor)
        Mark Young
        David Unger

ITEMIZED STATEMENT

Report Date : 29-JUN-11

As of Date (DD-MMM-YYYY) : 29-JUN-2011
Customer No                 : 23733-73285-01-RAM
Category Set                :
Category Group              :
Group No                    :
Bankruptcy                  : No Bankruptcy Sites
Disputed                    : No
Finance Charges Included:   Yes

Page 1 of 7

Report Date : 29-JUN-11

ITEMIZED STATEMENT

Customer No : 23733-73285-01-RAM
Address : BANKRUPT:6595 US Hwy 49, Hattiesburg, MS, 39401, US
As of Date: 29-JUN-2011

| Non-Year | Invoice No | Invoice Date | Description | Accrued | Billing | Amount Tax | FinanceCharges | Total |
|---|---|---|---|---|---|---|---|---|
| FEB-2010 | 25043099 | 22-FEB-10 | WYNRRWARDS 5% | | 34.21 | 0.00 | 1.02 | 35.23 |
| | 41297641 | 28-FEB-10 | Accrual-1230A-R | | 1470.79 | 0.00 | 312.55 | 1783.34 |
| | 41296936 | 28-FEB-10 | Accrual-1000A-R | | 1307.37 | 0.00 | 277.78 | 1585.15 |
| | 41280508 | 28-FEB-10 | 5002A-OPERA XPR | * | 383.84 | 0.00 | 81.57 | 465.41 |
| | 41280093 | 28-FEB-10 | 5715A-HughesNet | | 97.14 | 6.80 | 17.95 | 121.89 |
| | | | Sub Total | | 3293.35 | 6.80 | 690.87 | 3991.02 |
| MAR-2010 | 30413185 | 12-MAR-10 | '10 GLOBAL CONF | | 999.00 | 0.00 | 197.79 | 1196.79 |
| | 25043187 | 22-MAR-10 | WYNRRWARDS 5% | | 147.59 | 0.00 | 29.15 | 176.74 |
| | 41331589 | 31-MAR-10 | Accrual-1000A-R | | 2785.64 | 0.00 | 550.16 | 3335.80 |
| | 41334456 | 31-MAR-10 | Accrual-1230A-R | * | 3133.85 | 0.00 | 618.91 | 3752.76 |
| | 41316136 | 31-MAR-10 | 5002A-OPERA XPR | * | 632.22 | 0.00 | 124.85 | 757.07 |
| | 41314697 | 31-MAR-10 | 5715A-HughesNet | | 160.00 | 11.20 | 33.80 | 205.00 |
| | | | Sub Total | | 7858.30 | 11.20 | 1554.66 | 9424.16 |
| APR-2010 | 10454143 | 01-APR-10 | GUEST SATISFACT | | 77.50 | 0.00 | 15.29 | 92.79 |
| | 10454141 | 01-APR-10 | GUEST SRVCS TRA | | 100.00 | 0.00 | 19.75 | 119.75 |
| | 30428688 | 14-APR-10 | ONLINE LRNG LIB | | 50.00 | 0.00 | 9.91 | 59.91 |
| | 25044107 | 22-APR-10 | WYNRRWARDS 5% | | 416.75 | 0.00 | 75.84 | 492.59 |
| | 41348965 | 30-APR-10 | 5715-HughesNet | | 160.00 | 11.20 | 31.14 | 202.34 |
| | 41368465 | 30-APR-10 | Accrual-1230A-R | * | 1173.78 | 0.00 | 213.61 | 1387.39 |
| | 41366881 | 30-APR-10 | Accrual-1000A-R | * | 1043.36 | 0.00 | 189.88 | 1233.24 |
| | 41349880 | 30-APR-10 | 5002A-OPERA XPR | | 632.22 | 0.00 | 115.06 | 747.28 |
| | | | Sub Total | | 3653.61 | 11.20 | 670.48 | 4335.29 |
| MAY-2010 | 25045284 | 22-MAY-10 | WYNRRWARDS 5% | | 363.66 | 0.00 | 60.73 | 424.39 |
| | 41384659 | 31-MAY-10 | 5002A-OPERA XPR | | 632.22 | 0.00 | 105.57 | 737.79 |
| | 41383970 | 31-MAY-10 | 5715A-HughesNet | | 160.00 | 11.20 | 28.58 | 199.78 |
| | 41400886 | 31-MAY-10 | Accrual-1000A-R | * | 2326.88 | 0.00 | 388.60 | 2715.48 |
| | 41401662 | 31-MAY-10 | Accrual-1230A-R | * | 2617.74 | 0.00 | 437.15 | 3054.89 |

Report Date : 29-JUN-11

ITEMIZED STATEMENT

Customer No : 23733-73285-01-RAM
Address : BANKRUPT:6595 US Hwy 49,Hattiesburg,MS,39401,US
As of Date: 29-JUN-2011

| Mon-Year | Invoice No | Invoice Date | Description | Accrued Billing | Amount Tax | FinanceCharges | Total |
|---|---|---|---|---|---|---|---|
| JUN-2010 | 30446895 | 04-JUN-10 | CPA Credit | (56.66) | 0.00 | 0.00 | (56.66) |
| | TX014845 | 20-JUN-10 | T/A COMMISSIONS | 12.20 | 0.00 | 1.84 | 14.04 |
| | 25045884 | 22-JUN-10 | WYNEWARDS 5% | 234.32 | 0.00 | 35.47 | 269.79 |
| | 10470094 | 24-JUN-10 | GUEST SATISFACT | 66.49 | 0.00 | 10.08 | 76.57 |
| | 10470094 | 24-JUN-10 | GUEST SRVCS TRA | 160.00 | 0.00 | 24.24 | 184.24 |
| | 41435412 | 24-JUN-10 | Accrual-1230A-R  * | 2091.02 | 0.00 | 316.80 | 2407.82 |
| | 41417936 | 30-JUN-10 | 5002A-OPERA XPR | 632.22 | 0.00 | 95.77 | 727.99 |
| | 41435442 | 30-JUN-10 | Accrual-1000A-R  * | 1858.68 | 0.00 | 281.59 | 2140.27 |
| | 41192275 | 30-JUN-10 | 5715A-HughesNet | 160.00 | 11.20 | 25.93 | 197.13 |
| | | | Sub Total | 6100.50 | 11.20 | 1020.63 | 7132.33 |
| JUL-2010 | 25047313 | 22-JUL-10 | WYNEWARDS 5% | 182.93 | 0.00 | 24.89 | 207.82 |
| | 41461004 | 31-JUL-10 | 5002A-OPERA XPR | 632.22 | 0.00 | 85.98 | 718.20 |
| | 41678811 | 31-JUL-10 | Accrual-1000A-R  * | 1623.36 | 0.00 | 220.77 | 1844.13 |
| | 41468645 | 31-JUL-10 | Accrual-1230A-R  * | 1826.28 | 0.00 | 248.38 | 2074.66 |
| | 41462823 | 31-JUL-10 | 5715A-HughesNet | 160.00 | 11.20 | 23.27 | 194.47 |
| | | | Sub Total | 5158.27 | 11.20 | 791.72 | 5961.19 |
| AUG-2010 | 10484271 | 12-AUG-10 | GUEST SATISFACT | 75.00 | 0.00 | 10.20 | 85.20 |
| | 10484272 | 12-AUG-10 | GUEST SRVCS TRA | 160.00 | 0.00 | 21.76 | 181.76 |
| | 25047786 | 22-AUG-10 | WYNEWARDS 5% | 200.86 | 0.00 | 24.28 | 225.14 |
| | 41499879 | 31-AUG-10 | Accrual-1000A-R  * | 1433.36 | 0.00 | 173.45 | 1606.81 |
| | 41500694 | 31-AUG-10 | Accrual-1230A-R  * | 1612.53 | 0.00 | 195.11 | 1807.64 |
| | 41499013 | 31-AUG-10 | 5715A-HughesNet | 160.00 | 11.20 | 20.71 | 191.91 |
| | 41499049 | 31-AUG-10 | 5002A-OPERA XPR | 632.22 | 0.00 | 76.49 | 708.71 |
| | | | Sub Total | 4424.79 | 11.20 | 603.29 | 5039.28 |

Page 3 of 7

ITEMIZED STATEMENT

Customer No : 23733-73285-01-RAM
Address :
BANKRUPT:6595 US Hwy 49,Hattiesburg,MS,39401,US
As of Date:  29-JUN-2011

Report Date : 29-JUN-11

| Mon-Year | Invoice No | Invoice Date | Description | Accrued | Billing | Amount Tax | FinanceCharges | Total |
|---|---|---|---|---|---|---|---|---|
| SEP-2010 | 10495867 | 09-SEP-10 | GUEST SRVCS TRA | | 160.00 | 0.00 | 19.36 | 179.36 |
| | 10495869 | 09-SEP-10 | GUEST SATISFACT | | 54.00 | 0.00 | 6.55 | 60.55 |
| | 25049188 | 22-SEP-10 | WYNREWARDS 5% | | 172.25 | 0.00 | 18.17 | 190.42 |
| | 41521877 | 30-SEP-10 | Accrual-1000A-R * | | 1230.40 | 11.20 | 129.81 | 1360.21 |
| | 41533166 | 30-SEP-10 | 5713a-HughesNet | | 160.00 | 0.00 | 18.05 | 189.25 |
| | 10500940 | 30-SEP-10 | GUEST SATISFACT | | 132.98 | 0.00 | 14.02 | 147.00 |
| | 10500941 | 30-SEP-10 | GUEST SRVCS TRA | | 160.00 | 0.00 | 16.88 | 176.88 |
| | 41523401 | 30-SEP-10 | 500A-OPERA XPR | | 632.22 | 0.00 | 66.70 | 698.92 |
| | 41533602 | 30-SEP-10 | Accrual-1230A-R * | | 1384.20 | 0.00 | 146.05 | 1530.25 |
| | | | Sub Total | | 4273.97 | 11.20 | 522.00 | 4807.17 |
| OCT-2010 | 10502117 | 07-OCT-10 | GUEST SRVCS TRA | | 160.00 | 0.00 | 16.88 | 176.88 |
| | 10502116 | 07-OCT-10 | GUEST SATISFACT | | 66.49 | 0.00 | 7.01 | 73.50 |
| | 30497001 | 08-OCT-10 | 2011 Ramada RMA | | 1785.00 | 0.00 | 107.11 | 1892.11 |
| | 10502987 | 14-OCT-10 | GUEST SATISFACT | | 88.29 | 0.00 | 9.32 | 97.61 |
| | 10504380 | 21-OCT-10 | GUEST SRVCS TRA | | 160.00 | 0.00 | 14.48 | 174.48 |
| | 25049960 | 22-OCT-10 | WYNREWARDS 5% | | 136.09 | 0.00 | 12.32 | 148.41 |
| | 41556067 | 31-OCT-10 | 5713a-HughesNet | | 160.00 | 11.20 | 15.49 | 186.69 |
| | 41567130 | 31-OCT-10 | Accrual-1230A-R * | | 657.23 | 0.00 | 59.49 | 716.72 |
| | 41566064 | 31-OCT-10 | Accrual-1000A-R * | | 584.20 | 0.00 | 52.88 | 637.08 |
| | 41554254 | 31-OCT-10 | 500A-OPERA XPR | | 632.22 | 0.00 | 57.21 | 689.43 |
| | | | Sub Total | | 4086.05 | 11.20 | 435.59 | 4532.84 |
| NOV-2010 | 10511392 | 17-NOV-10 | GUEST SRVCS TRA | | 160.00 | 0.00 | 12.00 | 172.00 |
| | 10511391 | 17-NOV-10 | GUEST SATISFACT | | 88.29 | 0.00 | 6.62 | 94.91 |
| | 25050625 | 22-NOV-10 | WYNREWARDS 5% | | 75.28 | 0.00 | 5.65 | 80.93 |
| | 41598716 | 30-NOV-10 | Accrual-1230A-R * | | 622.49 | 0.00 | 46.69 | 669.18 |
| | 41598292 | 30-NOV-10 | Accrual-1000A-R * | | 553.32 | 0.00 | 41.51 | 594.83 |
| | | | Sub Total | | 4429.52 | 11.20 | 352.19 | 4792.91 |

Page 4 of 7

Customer No : 23733-73285-01-RAM
Address : BANKRUPT:6595 US Hwy 49,Hattiesburg,MS,39401,US
As of Date: 29-JUN-2011

ITEMIZED STATEMENT

Report Date : 29-JUN-11

| Mon-Year | Invoice No | Invoice Date | Description | Accrued | Billing | Amount Tax | FinanceCharges | Total |
|---|---|---|---|---|---|---|---|---|
| NOV-2010 | 41590710 | 30-NOV-10 | 5002A-OPERA XFR | | 632.22 | 0.00 | 47.41 | 679.63 |
| | 41589452 | 30-NOV-10 | 5715A-HughesNet | | 160.00 | 11.20 | 12.84 | 184.04 |
| | | | Sub Total | | 2291.60 | 11.20 | 172.72 | 2475.52 |
| DEC-2010 | 41591542 | 22-DEC-10 | WYNEWARDS 5% * | | 82.95 | 0.00 | 4.94 | 87.89 |
| | 41630565 | 31-DEC-10 | Accrual-1000A-R * | | 925.08 | 0.00 | 55.05 | 980.13 |
| | 41630543 | 31-DEC-10 | 5002A-OPERA XFR | | 632.22 | 0.00 | 37.61 | 669.83 |
| | 41632301 | 31-DEC-10 | Accrual-1230A-R * | | 1040.72 | 0.00 | 61.92 | 1102.64 |
| | 41619162 | 31-DEC-10 | 5715A-HughesNet | | 160.00 | 11.20 | 10.18 | 181.38 |
| | | | Sub Total | | 2840.97 | 11.20 | 169.70 | 3021.87 |
| JAN-2011 | 25052626 | 22-JAN-11 | WYNEWARDS 5% * | | 7.15 | 0.00 | 0.41 | 7.56 |
| | 41662913 | 31-JAN-11 | 5715A-HughesNet * | | 160.00 | 11.20 | 8.98 | 180.18 |
| | 41664530 | 31-JAN-11 | Accrual-1230A-R * | | 3675.15 | 0.00 | 192.94 | 3868.09 |
| | 41662300 | 31-JAN-11 | 5002A-OPERA XFR | | 632.22 | 0.00 | 33.19 | 665.41 |
| | 41664154 | 31-JAN-11 | Accrual-1000A-R * | | 3266.80 | 0.00 | 171.51 | 3438.31 |
| | | | Sub Total | | 7741.32 | 11.20 | 407.03 | 8159.55 |
| FEB-2011 | 25052875 | 22-FEB-11 | WYNEWARDS 5% * | | 62.30 | 0.00 | 2.59 | 64.89 |
| | 41697898 | 28-FEB-11 | Accrual-1230A-R * | | 4235.22 | 0.00 | 163.06 | 4398.28 |
| | 41681542 | 28-FEB-11 | 5715A-HughesNet * | | 160.00 | 11.20 | 6.59 | 177.79 |
| | 41681391 | 28-FEB-11 | 5002A-OPERA XFR | | 632.22 | 0.00 | 24.34 | 656.56 |
| | 41696750 | 28-FEB-11 | Accrual-1000A-R * | | 3764.64 | 0.00 | 144.94 | 3909.58 |
| | | | Sub Total | | 8854.38 | 11.20 | 341.52 | 9207.10 |
| MAR-2011 | 41727150 | 31-MAR-11 | Accrual-1000A-R * | | 1207.72 | 0.00 | 27.78 | 1235.50 |
| | 41713812 | 31-MAR-11 | 5002A-OPERA XFR | | 632.22 | 0.00 | 14.54 | 646.76 |

Page 5 of 7

ITEMIZED STATEMENT

Customer No : 23733-73285-01-RAM
Address : BANKRUPT:6595 US Hwy 49,Hattiesburg,MS,39401,US
As of Date: 29-JUN-2011

Report Date : 29-JUN-11

| Mon-Year | Invoice No | Invoice Date | Description | Accrued | Billing | Amount Tax | FinanceCharges | Total |
|---|---|---|---|---|---|---|---|---|
| | 41713774 | 31-MAR-11 | 5715b-HughesNet | | 160.00 | 11.20 | 3.93 | 175.13 |
| | 41728763 | 31-MAR-11 | Accrual-1230k-R | * | 1358.69 | 0.00 | 31.25 | 1389.94 |
| | | | Sub Total | | 3358.63 | 11.20 | 77.50 | 3447.33 |
| APR-2011 | 10533679 | 07-APR-11 | GUEST SATISFACT | | 40.00 | 0.00 | 0.78 | 40.78 |
| | 10533678 | 07-APR-11 | GUEST SRVCS TRA | | 160.00 | 0.00 | 3.12 | 163.12 |
| | 20055356 | 22-APR-11 | WYNEWARDS 5% | | 58.95 | 0.00 | 0.71 | 59.66 |
| | 41955326 | 30-APR-11 | Accrual-1000A-R | | 1067.64 | 0.00 | 8.54 | 1076.18 |
| | 41759369 | 30-APR-11 | Accrual-1230A-R | * | 1201.10 | 0.00 | 9.61 | 1210.71 |
| | 41744711 | 30-APR-11 | 5715b-HughesNet | | 160.00 | 11.20 | 1.37 | 172.57 |
| | 41744982 | 30-APR-11 | 5002A-OPERA XFR | | 632.22 | 0.00 | 5.06 | 637.28 |
| | | | Sub Total | | 3319.91 | 11.20 | 29.19 | 3360.30 |
| MAY-2011 | 25055898 | 22-MAY-11 | WYNEWARDS 5% | | 112.07 | 0.00 | 0.00 | 112.07 |
| | 41776115 | 31-MAY-11 | 5715b-HughesNet | | 160.00 | 11.20 | 0.00 | 171.20 |
| | 41791261 | 31-MAY-11 | Accrual-1230A-R | * | 2900.39 | 0.00 | 0.00 | 2900.39 |
| | 41776630 | 31-MAY-11 | 5002A-OPERA XFR | | 632.22 | 0.00 | 0.00 | 632.22 |
| | 41790340 | 31-MAY-11 | Accrual-1000A-R | * | 2578.12 | 0.00 | 0.00 | 2578.12 |
| | | | Sub Total | | 6382.80 | 11.20 | 0.00 | 6394.00 |
| JUN-2011 | 10546367 | 16-JUN-11 | GUEST SATISFACT | | 28.00 | 0.00 | 0.00 | 28.00 |
| | 10546368 | 16-JUN-11 | GUEST SRVCS TRA | | 160.00 | 0.00 | 0.00 | 160.00 |
| | 25056770 | 22-JUN-11 | WYNEWARDS 5% | | 185.48 | 0.00 | 0.00 | 185.48 |
| | | | Sub Total | | 373.48 | 0.00 | 0.00 | 373.48 |

ITEMIZED STATEMENT

Report Date : 29-JUN-11

Customer No : 23733-73285-01-RAM
Address : BANKRUPT:6595 US Hwy 49,Hattiesburg,MS,39401,US
As of Date: 29-JUN-2011

| Mon-Year | Invoice No | Invoice Date | Description | Accrued Billing | Amount Tax | FinanceCharges | Total |
|---|---|---|---|---|---|---|---|
| | | | Grand Total | 78441.45 | 174.80 | 7839.09 | 86455.34 |

Requested By: Dayna Brewer

* Please note the accruals on your account are estimates.
Make sure to promptly submit your actual gross room revenue and rooms sold.

******* END OF REPORT *******

Page 7 of 7

## DE-IDENTIFICATION PROCEDURES

You must complete each of the following within 10 days after the Termination Date:

1.   Remove, replace or cover with an opaque cover the primary Facility signage.

2.   Remove all interior signage that contains Ramada Marks.

3.   Change advertising billboards to remove Ramada Marks.

4.   Stop answering Facility telephone as Ramada guest lodging facility.

5.   Remove Ramada name and Marks from any domain name, advertising and brochures.

6.   Return to us all confidential operations and training manuals.

7.   Remove the Ramada name and Marks from the following items:

| | |
|---|---|
| Stationery, pads and pens | Soap/shampoo |
| Directories and brochures | Key tags |
| Business cards | Credit card imprinter |
| Folios and registration cards | Laundry bags |
| Do-not-disturb cards | Name tags/uniforms |
| Comment cards | Ice buckets/trays |
| Telephone plates | Ashtrays/matches |
| Telephone dialing instructions | Plaques |
| TV channel ID plates | Guest checks/receipts |
| Rate/law cards | Menus |
| Door signage | |

8.   Paint over or remove any distinctive Ramada trade dress, paint schemes or architectural features.

9.   It is prohibited to re-name the Facility with a confusingly similar name or color scheme as a Ramada facility.

10.   Our quality assurance inspectors will visit the Facility at any time after 10 days after the Termination Date to verify that you have performed these de-identification obligations.